Oscar W. EGERVARY

v.

Virginia YOUNG, et al.

CIV. A. No. 96–3039.

United States District Court,
E.D. Pennsylvania.

Sept. 6, 2001.

Atty, Philadelphia, PA, for Virginia Young, James Schuler, defendants.

Richard A. Kraemer, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Frederick P. Rooney, James J. Burke, defendants.

Deborah R. Popky, Robert S. Tintner, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, Frederick C. Horn, Fox, Rothschild, O'Brien and Frankel, LLP, Lansdale, PA, for Jeffrey C. Nallin, defendant.

Gary L. Azorsky, Schnader Harrison Segal & Lewis, Philadelphia, PA, for plaintiff.

Richard Mentzinger, Jr., Keir N. Dougall, James G. Sheehan, Office of U.S.

*MEMORANDUM*

O'NEILL, Distict Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................136

II. BACKGROUND ..................................................136
 A. Oscar's Alleged Abduction and Return to Hungary .........................136
 B. The Hague Convention/ICARA Proceedings ..............................137
 1. The Law ..............................................137
 2. The Proceedings .........................................139
 C. The History of This Action ...........................................146

III. DISCUSSION ..................................................149
 A. Venue .........................................................149
 1. The Law of the Case Doctrine .............................149
 2. A Substantial Part of the Events Giving Rise to the Claim ...............150
 B. Service of Process ................................................151
 1. Rule 4 and Pa. R. Civ. P. 403 ...........................152
 2. 22 C.F.R. § 172.2 .......................................153
 C. Statute of Limitations ............................................154
 1. Rule 54(b) .............................................155
 2. Rule 15(c) and the Relation Back Doctrine ...........................156
 3. Equitable Estoppel ......................................158
 D. Qualified Immunity ...............................................160
 1. Due Process Violation ....................................160
 a. Liberty Interest ......................................161
 b. The Constitutional Sufficiency of the Process ......................162
 2. Clearly Established Right .................................164
 a. Federal Law as of May 1994 ...........................164
 b. Violations of ICARA, State Law, and Federal Regulations ..........167
 3. The Federal Defendants' Reply Arguments ...........................169
 E. Personal Involvement .............................................171
 1. The Summary Judgment Standard .........................171
 2. The Legal Standard for Personal Involvement in a Constitutional
 Tort ...............................................172
 3. Evidence of Personal Involvement ...............................173
 a. The Retention of and Assistance to Rooney and the Model
 Pleadings .........................................173
 b. The Phone Call to Judge Nealon's Chambers ....................175
 c. The Federal Defendants' Ignorance of the "Fourth Option" .........177

d. The Federal Defendants' Ignorance of the *Ex Parte* Nature of
the Meeting with Judge Nealon ................................. 178
e. The Phone Calls after the Meeting with Judge Nealon .............. 181
f. · The Passport Waiver .......................................... 182
g. Schuler's Follow Up Letter ................................... 183

IV. CONCLUSION .............................................. 184

## I. INTRODUCTION

This case is a *Bivens* action alleging the violation of plaintiff's due process rights during an international child custody dispute and has been the subject of four prior memorandum opinions. *See Egervary v. Young*, No. 96–3039, 1997 WL 9787 (E.D.Pa. Jan.7, 1997) (Troutman, J.) ("*Egervary I* "); *Egervary v. Rooney*, 80 F.Supp.2d 491 (E.D.Pa.2000) (O'Neill, J.) ("*Egervary II* "); *Egervary v. Rooney*, No. 96–3039, 2000 WL 1160720 (E.D.Pa. Aug.15, 2000) (O'Neill, J.) ("*Egervary III* "); and *Egervary v. Young*, 152 F.Supp.2d 737 (E.D.Pa.2001) (O'Neill, J.) ("*Egervary IV* "). Presently before me are: 1) the federal defendants' motion to dismiss the amended complaint for improper venue pursuant to Rule 12(b)(3); 2) the federal defendants' motion to dismiss the amended complaint for insufficient service of process pursuant to Rule 12(b)(5); 3) the federal defendants' motion to dismiss the amended complaint for failure to state a claim pursuant to Rule 12(b)(6) on two grounds, statute of limitations and qualified immunity; and 4) the federal defendants' motion for summary judgment pursuant to Rule 56 on the grounds that they had no personal involvement in the alleged constitutional tort. For the reasons stated below, the motions will be DENIED.

## II. BACKGROUND

### A. Oscar's Alleged Abduction and Return to Hungary

Plaintiff Egervary was born in 1955 in Hungary, where he suffered political oppression at the hands of the then-communist government because his father was a church official.[1] *See* Egervary Aff. (June 9, 1994) ¶¶ 1–2. In 1980, he emigrated to the United States as a political refugee. *Id.* He became a U.S. citizen in 1987. *Id.* ¶ 3.

In 1990, Egervary became romantically involved with Aniko Kovacs, a Hungarian national who came to the U.S. to study music. *Id.* ¶ 4. They briefly returned to Hungary in 1991 to be wed by Egervary's father. *Id.* Thereafter, they established their marital residence in Hackensack, New Jersey. *Id.* ¶ 5. Their son, Oscar Jonathan Egervary, was born on Independence Day, July 4, 1992. *Id.* ¶ 6.

In February 1993, Kovacs, a concert violinist, traveled to Hungary with Oscar to perform in a concert to be held in Budapest that March. *Id.* ¶ 7. They were scheduled to return to the U.S. on April 6, 1993, and Egervary had purchased a ticket to fly to Hungary and escort them back. *See* Egervary Aff. (July 7, 1994) ¶ 2. A few days before, however, Kovacs called Egervary and said she needed to stay until the beginning of May to perform in another concert. *Id.* Shortly before she and Oscar were to return in May, Kovacs again called Egervary and said that she would be staying in Hungary because she had an oppor-

---

**1.** The father, Oscar Egervary, will be referred to as "Egervary" or "plaintiff." The son, Oscar Jonathan Egervary, will be referred to as "Oscar."

tunity to take a teaching position in Budapest until the end of the year. *Id.* Shortly thereafter, she separated from Egervary and informed him that she would not return to the U.S. and would not return Oscar to this country. *Id.*

In June and July of that year, Egervary traveled to Hungary in an attempt to reconcile with his wife and bring Oscar home. *Id.* In July, Kovacs returned to the U.S. with Egervary for a short time, but she insisted on leaving Oscar in Hungary with her parents. *Id.*

In August, Egervary returned to Hungary and stayed for three months in another attempt to reconcile with his wife. *Id.* During that stay, he took a job teaching English in order to support himself. *Id.* He stayed there from approximately August to November of 1993. *Id.* He brought some personal belongings from the U.S., but he did not plan on establishing residence there and did not register with the Hungarian government as a resident. *Id.*

In September, Kovacs took Oscar to an undisclosed location in Hungary in an apparent attempt to hide the child from his father. *See* Egervary Aff. (June 9, 1994) ¶ 8. At that time, she left Egervary a letter that, in part, stated: "I'd like to notify you in this farewell letter that I've moved out from you, together with Ossika [i.e., Oscar] ... I moved to a location unknown to others deliberately and I didn't move to my parents on purpose." *See* Egervary Aff. (July 7, 1994) ¶ 3. Egervary searched for his son for approximately three months. *Id.* During that time, he consulted with the American Embassy in Budapest and was told that if he could find Oscar he was free to take the child back to the U.S. *Id.*

On December 18, 1993, Egervary found Kovacs and Oscar leaving her parents' apartment house in Budapest. *Id.* According-ing to Egervary, Oscar's clothing was "dirty and ragged" and the boy appeared undernourished. *See* Egervary Aff. (June 9, 1994) ¶ 9. Egervary took Oscar from Kovacs and left Hungary with him the next day. *Id.* Upon their return to the U.S., Egervary set up residence with his son in Monroe County, Pennsylvania. *Id.*

On May 13, 1994, members of the Pennsylvania State Police and U.S. Marshals arrived at Egervary's home with an order signed by the Honorable William J. Nealon of the United States District Court for the Middle District of Pennsylvania. *Id.* ¶ 10. Pursuant to the order, Oscar was removed from Egervary's custody and delivered to defendant Frederick P. Rooney, Esq. *Id.* Rooney then took Oscar to the airport, flew him to Europe, and returned the child to his mother. *See* Rooney Dep. at 169. All parties concede that Egervary was given no notice of or opportunity to be heard in the *ex parte* Hague Convention/ICARA proceedings that led to the order.

### B. The Hague Convention/ICARA Proceedings

#### 1. The Law

The Hague Convention on the Civil Aspects of International Child Abduction is a multilateral international treaty on parental kidnaping adopted by the United States and other nations in 1980. The goal of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *See* Hague Convention, Preamble. The Convention reflects "a universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to implement an effective deterrent to such behavior." *Feder v. Evans–Feder,* 63 F.3d 217,

221 (3d Cir.1995). The Convention is "designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child." *Id.*

The United States has implemented the Hague Convention by enactment of the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* ICARA vests state and district courts with concurrent jurisdiction over claims arising under the Convention and empowers those courts to order the return of kidnaped children. *See* 42 U.S.C. § 11603. An ICARA hearing is not a custody hearing. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir.1999) (under ICARA, a district court has "the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim"), *quoting Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993); Hague Convention, Article 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). An ICARA proceeding merely determines which nation should hear the underlying custody claim. *See Blondin*, 189 F.3d at 246.

An ICARA petitioner bears the burden of proving by a preponderance of the evidence that the child in question has been wrongfully removed from the nation of his or her "habitual residence" immediately before the removal. *See* 42 U.S.C. § 11603(e)(1)(A); Hague Convention, Articles 3 and 4.[2] If the petitioner establishes that the removal was wrongful, the child must be returned unless the respondent can establish one or more of four defenses: 1) the ICARA proceedings were not commenced within one year of the child's abduction; 2) the petitioner was not actually exercising custody rights at the time of the

removal; 3) there is a grave risk that return would expose the child to "physical or psychological harm or otherwise place the child in an intolerable situation"; or 4) return of the child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms." *Id.;* Hague Convention, Articles 12, 13 and 20. The first two defenses can be established by a preponderance of the evidence; the last two must be established by clear and convincing evidence. *Id.;* 42 U.S.C. § 11603(e)(2).

ICARA also provides that notice "be given in accordance with the applicable law governing notice in interstate child custody proceedings." *See* 42 U.S.C. § 11603(c). Courts interpreting this provision have found the "applicable law" to be the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A ("PKPA"), and the Uniform Child Custody Jurisdiction Act, 23 Pa.C.S.A. § 5341, et seq. ("UCCJA"). *See Brooke v. Willis*, 907 F.Supp. 57, 60 (S.D.N.Y. 1995); *Klam v. Klam*, 797 F.Supp. 202, 205 (E.D.N.Y.1992). Both PKPA and UCCJA provide for "reasonable notice and opportunity to be heard." *See* 28 U.S.C. § 1738A(e); 23 Pa.C.S.A. § 5345. This generally means "a plenary hearing at which both sides are heard." *Klam,* 797 F.Supp. at 205. However, because there is an inherent risk of flight during the pendency of a petition, courts "may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." *See* 42 U.S.C. § 11604(a).

The Convention also provides that "a Contracting State shall designate a Central Authority to discharge the duties

---

**2.** The Hague Convention and ICARA also apply if a child has been wrongfully retained outside of the nation of his or her "habitual residence." *Id.*

which are imposed by the Convention upon such authorities." *See* Hague Convention, Article 6. The Bureau of Consular Affairs of the U.S. Department of State has been designated the Central Authority for the United States. *See* 22 C.F.R. § 94.2. The Convention describes the duties of such Central Authorities:

> Central Authorities shall cooperate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.
>
> In particular, either directly or through any intermediary, they shall take all appropriate measures
>
> (a) to discover the whereabouts of a child who has been wrongfully removed or retained;
>
> (b) to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;
>
> (c) to secure the voluntary return of the child or to bring about an amicable resolution of the issues;
>
> (d) to exchange, where desirable, information relating to the social background of the child;
>
> (e) to provide information of a general character as to the law of their State in connection with the application of the Convention;
>
> (f) to initiate or facilitate the institute of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

> (g) where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisors;
>
> (h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;
>
> (i) to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

*See* Hague Convention, Article 7. *See also* 22 C.F.R. § 94.6.

State Department regulations implementing the Convention further clarify these duties. The regulations provide that State Department officials are "prohibited from acting as an agent or attorney or in any fiduciary capacity in legal proceedings arising under the Convention." *See* 22 C.F.R. § 94.4(a). They may, however, "[a]ssist applicants in securing information useful for choosing or obtaining legal representation, for example, by providing a directory of lawyer referral services, or *pro bono* listing published by legal professional organizations, or the name and address of the state attorney general or prosecuting attorney who has expressed a willingness to represent parents in this type of case and who is employed under state law to intervene on the applicant's behalf." *See* 22 C.F.R. § 94.6(d).

## 2. The Proceedings

Sometime prior to Oscar's removal from the United States on May 13, 1994, Kovacs had sought and received the State Department's help in retrieving her son, who, she claimed, had been kidnaped from Hungary by his father. On May 10th or 11th,[3]

---

**3.** It is unclear whether Young's first contact with Rooney occurred on May 10th or May 11th. In his deposition, Rooney stated that it was May 11th. *See* Rooney Dep. at 56.

Young's follow-up letter to that conversation, however, is dated May 10th. *See* Young Ltr. (May 10, 1994).

defendant Virginia Young of the Bureau of Consular Affairs had contacted defendant Rooney and asked him to represent Kovacs in filing an ICARA petition. *See* Rooney Dep. at 55–56. In what appears to be a follow-up letter to a phone conversation earlier that day, Young wrote:

> Dear Mr. Rooney,
>
> The case I hope you will be able to accept is that of an almost-two-year-old child, Oscar Egervary, who, according to the information we have, was quite brutally kidnapped by his father and brought to the U.S. The mother, your client-to-be, is a violin soloist in Budapest and the father in the U.S. is unemployed, so I'm sorry but it doesn't look like there's any money anywhere.
>
> The child was born in the U.S. but the family apparently decided to go back home, and apparently the father gave up job [sic] and belongings to relocate. And then seems to have changed his mind. I figure the Hague applies in that the child lived a month or two longer in Hungary than he did in the U.S. and the information seems to indicate that Hungary had been established as the place of residence when the father did the kidnapping . . .
>
> I hope you can help. Thanks for your consideration of this case.

*See* Young Ltr. (May 10, 1994).[4]

Rooney accepted the case, and immediately began receiving assistance from Young. *See* Rooney Dep. at 62. He had never handled a Hague Convention case in the United States. *See* Rooney Dep. at 23–25, 30, 61–62.[5] He therefore needed assistance "in trying to figure out how to best file the order." *Id.* at 62. He "had to rely on them to help [him] through it" because he "was not extremely well-versed on The Hague."

Some of this assistance consisted of written materials. On the day he took the case, Young faxed Rooney Hungarian government documents regarding Egervary's alleged abduction of his son and Kovacs' subsequent Hague Convention petition to the Hungarian government. *Id.* She also sent him model ICARA pleadings that had been published by the ABA. *Id.* at 63–64. Those model pleadings contained three different options for effecting the return of the child. *See* Federal Defendants' Br. (July 9, 2001) at Exhibit G ("Model Petition") and Exhibit H ("Model Warrant"). All three of those options suggested an initial *ex parte* proceeding without notice to the alleged parent-kidnapper, followed by seizure of the child and a prompt post-deprivation hearing with notice. *Id. See also infra* Part III–E–3–a.

The federal defendants' assistance to Rooney was not, however, limited to transmission of those written documents. Between May 10th and May 13th, Rooney spoke to Young, and possibly also to defendant James Schuler, "a bunch of times." *See* Rooney Dep. at 62, 74. There were "a bunch of phone calls" about "where the

---

**4.** I note that Egervary's sworn testimony, the only testimony in this case on these points, refutes most of the factual claims Young makes in this letter. Egervary denied that there was any "brutality" on December 18, 1993 when he retrieved Oscar. *See* Egervary Dep. at 53. He also denied that he intended at any time to relocate to Hungary. *See* Egervary Aff. (July 7, 1994) ¶ 2. In addition, the claim that Oscar had "lived a month or two longer in Hungary than he did in the U.S." ignores Egervary's contention that Kovacs began illegally retaining Oscar in Hungary as of May 1993 and hid the child from his father as of September 1993. *Id.* ¶ 2; Egervary Aff. (June 9, 1994) ¶ 8.

**5.** Rooney may have handled one Hague Convention case prior to the Egervary matter, but that case took place in the Danish courts. *Id.* at 23–25.

child was" and "how to get an order together." *Id.* at 62–63. As defendant James Burke, Rooney's associate, later described it, "they seemed to be calling constantly ... I remember the phone calls was [sic] constantly coming in and it was the State Department ... they were calling all the time it seemed like." *See* Burke Dep. at 26–27. During this period, Rooney never spoke with Kovacs or any member of her family. *See* Rooney Dep. at 86–89.

On May 13, 1994, Rooney, Burke, and local counsel Jeffrey Nallin filed an ICARA petition in the Middle District.[6] The petition was similar to the model pleadings that Young had sent Rooney earlier that week, but there was one difference. In addition to the three options that provided for seizure of the child without notice followed a postdeprivation hearing with notice, Rooney included a fourth option that eliminated the postdeprivation hearing. Specifically, the fourth option directed "any peace officer within the Commonwealth of Pennsylvania" to "take into protective custody Oscar Jonathan Egervary and deliver him to Petitioner's agent [i.e., Rooney] for immediate return to the physical custody of Petitioner [i.e., Kovacs]." *See* Federal Defendants' Br. (July 9, 2001) at Exhibit F.

After filing the petition, Rooney met with Judge Nealon, to whom the petition had been assigned. According to Rooney, when he arrived in Judge Nealon's chambers someone from the State Department had already called to inform the Court that a Hague Convention petition was going to be presented that day:

Q: In your Answers to Interrogatories I believe you said, and I don't have them in front of me but I will get

them if there's a question about this, I believe that you said that the State Department had contacted the court to arrange for you to appear before Judge Nealon.

A: I don't know if they called to arrange. They called to inform the court that a petition would be presented involving a Hague matter. I don't know who called, I don't know with whom they spoke; I just knew that by the time we got there the judge was aware or the judge's chambers was aware of someone coming in with a petition. I also think that we may have called, someone from my office may have called, to advise the judge that we were on our way to Scranton.

Q: What made you think that someone from the State Department had contacted chambers?

A: I may have recalled the secretary saying, Oh, yes, we got a call from the State Department saying that a petition was going to be brought in.

*See* Rooney Dep. at 120–21. *See also* Rooney Interrogatories (July 17, 1998) at 7(c); Rooney Amended Answers (undated) at 7(c).

During the meeting, Rooney argued that Judge Nealon should order the fourth option, i.e., the immediate return of the child to his mother in Hungary. Judge Nealon, however, doubted whether such an order would be lawful:

Q: ... What reservations did the judge express?

A: I think he questioned whether or not he had the authority to order the return of the child, and I said all

---

6. Nallin was named as a defendant, but summary judgment was entered in his favor in

*Egervary III*, 2000 WL 1160720, at \*6.

I could tell him is that in my experience in foreign jurisdictions, and I mean domestic foreign, not Pennsylvania, that under the UCCJA that with a certified copy of a court order that you could go from Pennsylvania to retrieve children in California with a certified Pennsylvania court order without having to invoke the whole process of hearings in California.

*Id.* at 125–26.

Because of these reservations, Rooney called the State Department and spoke to Schuler to confirm that Judge Nealon had the authority to order the immediate return of the child:

Q: Did you speak to him [i.e., Schuler] about it [i.e., the relief requested] before it was presented to the court or after?

A: In between.

Q: Meaning what?

A: I went in and I saw Judge Nealon. I spoke to him about the situation, presented him with the petitions and the order, and to the best of my recollection he then had a status conference or had to do something, and so he adjourned our meeting. I waited and during that period of time I spoke to Jim Schuler because the judge was specifically concerned about whether or not he had the authority to allow the child to be returned. While it was my impression that he did, in order to assure the judge that, in fact, my interpretation of his authority was correct, I called Schuler from the Judge's chambers and I said, Jim, Judge Nealon appears to be willing to sign an order for the child to be returned, but he wants to just be sure that that's within his authority and Schuler said to me he's the judge.

He's got the authority to make whatever decision he wants.

. . . . .

Q: Tell me, as best you remember, what was said during that telephone conversation.

A: That I was in the judge's chambers and that he had a petition and one of the options was the return of the child to Hungary, and that he had some concern about whether or not that was in his discretion. I said to you before, his answer was he's the judge. Basically this is not verbatim, but he's the judge. He can do whatever he feels is appropriate.

Q: Did you, during that conversation, advise Mr. Schuler that no notice of this, the filing of this petition, had been given to Mr. Egervary?

A: No, but I think that we would have assumed that that was the case simply because in most Hague matters notice is not given to someone who has been determined to be an abducting parent for fear that upon notice of something pending that there would be a flight with a child. It would have been highly irregular to give notice to a parent in this situation for fear that the child would then be taken someplace else.

*Id.* at 115–16, 131–32.

Rooney also states that after his conversation with Schuler he discussed other options with Judge Nealon:

Q: And what was discussed during that second meeting in chambers with the judge?

A: We talked about alternatives that he had under the order that I had presented, and that in instances children are taken into protective custody and that the child could

have been held by social services in Monroe County. I don't remember what else could have been done right now, but that he could have gone into a juvenile shelter, that he could have been taken into protective custody.

Q: And you described those alternatives to the judge?

A: Correct.

Q: And then what was said?

A: Well, I remember the judge mentioning, it was Friday and it may have been difficult to get protective services in at that time, given the time of day or the fact that it was a Friday. That I remember. And I told him that I didn't know anyone else in the area. I didn't know if there was any other family members with whom the child could be left, and that given those circumstances, whatever his decision was I would abide by it and respect it, but I told him if the child, if he ordered the return of the child, that I would take the child to Hungary.

*Id.* at 133–34.

Judge Nealon's testimony agrees with much of Rooney's testimony, but it differs on a few key points.[7] According to Judge Nealon, Rooney: 1) portrayed himself as representing the State Department; 2) stated that he was seeking to have the Judge enforce a Hungarian court order; 3) had already made arrangements to return the child to Hungary that day; and 4) never suggested any remedy that would require Judge Nealon to conduct a hearing on the matter:

Q: What did Mr. Rooney tell you about them [i.e., the papers that had been filed in support of the petition]?

A: Well, capsulizing what he told me and I have to use this word advisedly whether he said he was retained, I thought he said he was retained, at least that's the impression I got, by the State Department to present this petition that there had been a proceeding in Hungary where a—at which the father was represented. And the court awarded custody to the mother and that the father went over to Hungary, kidnaped the youngster and took the youngster back and was now located in Cresco in Monroe County. And what he was seeking to do was enforce the Hungarian Court judgment by signing the warrant and picking up the child. And once again, and you people can flush it out later, it was indicated to me that this was the appropriate remedy and that the arrangements had been made to take the child and return, I think, that day to Hungary. It was a very critical period, according to him, that something had to be done promptly.

Q: Was that because arrangements had already been made to take the child back?

A: Well, that had been represented that the arrangements had been made. Now, the extent of them I don't know. Whether he said he

7. In *Egervary IV,* I denied the federal defendants' motion for a protective order to stop Judge Nealon's deposition from going forward while the motion to dismiss on the basis of qualified immunity was pending. In so doing, I "question[ed] whether I have the power to compel Judge Nealon to testify about events that occurred in his chambers during official proceedings." *See Egervary IV,* 152 F.Supp.2d at 742–43. I noted, however, that I did not have to resolve that question because Judge Nealon had agreed to give his deposition. *Id.* at 744–45. *See also Egervary II,* 80 F.Supp.2d at 495–96 n. 3.

had an airplane ticket or could get an airplane ticket or something along that line I don't know. But it was really an emergency matter according to him.

. . . . .

A: And let me—I know the petition mentions hearings, but at no time did he suggest a hearing to me. I want to be empathic about that. That this—that while hearings may have been required in a normal kidnaping context, here was a court order out of Hungary and that he had been retained by the State Department to implement this and pick up this child and have her returned to Hungary. It was an interpretation of international law. And I remember being concerned about it and saying that I want to find out if this is the official State Department position. I don't have experience in these matters and I'm willing to take their representation if they say that no hearing is required, no notice is required, and that the child should be immediately picked up and turned over to Mr. Rooney for prompt return to Hungary.

Q: When you said that to Mr. Rooney what did he do?

A: He made a phone call and came back and said, yes, they said that is the remedy they're seeking and that is the appropriate remedy.

. . . . .

Q: During that meeting did Mr. Rooney show you a copy of the language of the Hague Convention on international child abduction to support that position?

A: I can't say that he did, but once again in a sophisticated legal area where—with which I have little familiarity I was prepared to rely upon the representation of the Department of State of the United States of America was telling me as a Judge that this was the remedy that was being sought. See, and I know there's dispute about the hearing, but the easiest thing in the world for me to do would be to order a hearing. I mean, if he came in and said one of your options is a hearing, I would have ordered that immediately. That would be the appropriate thing to do. I had to be talked out of it. And I was talked out of it by saying this is what the State Department says that that—the appropriate remedy and the remedy they're seeking is the immediate taking custody of the youngster and taking him right back to his mother in recognition of a valid order from Hungary. I can't conceive of why I would ask him to call the State Department if I was going to set a hearing. Why would I need to ask the State Department about a hearing? The only reason I wanted to call the State—to have the State Department called was he was telling me there was no need for notice and no need for a hearing. And the word came back that this was correct that is what they were seeking and that was the appropriate thing for me to do.

See Nealon Dep. at 16–20, 22–24.

Judge Nealon also repeatedly emphasized that he ordered the immediate return of the child because he was relying upon what he perceived to be the State Department's representation that that remedy was appropriate:

Q: Now, among the other choices available on this second page are choices which would enable the child to be taken into protective custody immediately and then released to either a juvenile shelter or to the mother or her agent and kept in this district pending a hearing. Did you discuss those options with Mr. Rooney or did Mr. Rooney suggest those as viable alternatives?

A: No. He did not suggest them. He did not suggest them. The only request he was making, as I said, was for the immediate action by the law enforcement officer to take the child into custody. See a hearing would have been the easiest thing in the world for me to do. If he had said you can hold a hearing, I'd say fine, let's set it down. About custody, I'd be willing to turn custody over to him. That would be no problem. I wouldn't be the least bit interested in what the State Department had to say at that point. There would be no need for me to make an emergency phone call. The State Department could make their arguments at the hearing, so I—they were never presented to me as alternatives ... And as I say— maybe it's too much trust, but you're inclined to rely on the expertise of a federal department that purportedly has expertise in that area. But I did have qualms about it. I mean, I just didn't sit down and sign it. I said I want you to get an assurance that this is the appropriate thing to do.

. . . . .

Q: And is it accurate to say that the reason that you wouldn't rely on that is because it would be important to know what the person from the State Department knew about the case, what he had been told about the case and what he had actually said about the case?

A: Absolutely. If it weren't for the involvement of the State Department I would not have taken the action I did take.

*Id.* at 26–28, 139–40.

After Judge Nealon signed the order, Rooney and Burke went to the U.S. Marshal's office to get the Marshal's assistance in executing the order. *See* Rooney Dep. at 157. While waiting in the Marshal's office, Rooney called the State Department to update them on what was happening. *See* Burke Dep. at 70–71. Rooney and Burke then accompanied the Marshals to Egervary's home. *See* Rooney Dep. at 157. The attorneys remained parked on the public road outside of Egervary's residence while the Marshals retrieved the child. *Id.* at 158–59. The Marshals brought the child to Rooney and Burke, who immediately drove the child to Newark International Airport. *Id.* at 160. On the way to the airport, Rooney again called the State Department to give them an update. *See* Burke Dep. at 70–71. In fact, as Burke later testified, Rooney was "continuously in conversation" with the State Department throughout that day. *Id.* at 71.

While they drove to Newark, Rooney directed Lori Mannicci, Esq., an associate in his office, to make travel arrangements for the trip to Europe. *See* Rooney Dep. at 156. Because Rooney did not have Oscar's passport, those travel arrangements included contacting the State Department to arrange for the child to be removed from the country without a passport. *Id.* at 165–66. Mannicci testified that she could not remember anything about contacting the State Department to arrange for the passport waiver, including

to whom she spoke. *See* Mannicci Dep. at 30–31. However, her handwritten notes from that afternoon include—on two separate pages—notations with "Ginny" Young's home telephone number. *Id.* at 19, 22–23 and Exhibits 9 and 10.

Rooney accompanied the child to Frankfort, Germany, and Kovacs was waiting for them in the airport when they arrived. *See* Rooney Dep. at 169.

Sometime thereafter, Egervary filed a motion for reconsideration before Judge Nealon. *See Egervary II,* 80 F.Supp.2d at 504–507. At that time, Rooney sought a follow-up letter from Schuler in order to "reassure" himself. *See* Rooney Dep. at 194. Schuler's letter to Rooney stated:

Dear Mr. Rooney,

This is to thank you for effecting the prompt return of the child Oscar Egervary to his mother in Hungary under the auspices of the Hague Convention on the Civil Aspects of International Child Abduction, and to briefly review the background of the case . . .

Oscar Egervary was born in the United States July 4, 1992, and at the age of approximately eight months was taken by his parents to Hungary, where both mother and father are citizens. (The father is also a U.S. citizen.) The parents separated in the summer of 1993 and the mother was granted temporary custody by a Hungarian court pending the couple's divorce.

Hungarian police reports indicate that in December 1993 the father and his brother accosted Mrs. Egervary in the street in Budapest and kidnapped the child. Mrs. Egervary attempted to hang on to the departing car, but fell off. She immediately filed a police report,

and soon after filed an application for the return of her son under the Hague Convention which was received in this office in March, 1994.

At the time of his abduction, Oscar Egervary had lived for 10 months in Hungary and eight months in the United States. In addition, the information provided this office indicated that the parents had intended resettlement in Hungary, in that their car and personal effects had been sent there and an apartment in Pennsylvania had been vacated.

It seemed clear that Oscar Egervary's country of habitual residence was Hungary and that Mrs. Egervary's claim of unlawful removal and retention of her child under Article 3 of the Hague Convention was a valid one.

We located your name on a list of persons who had previously handled Hague Convention matters, and asked you to represent Mrs. Egervary. You agreed to assist on a *pro bono* basis.

Article 2 of the Convention asks that "the most expeditious procedures available" be utilized in effecting the implementation of Convention Precepts.

We are grateful for your prompt, humane and professional assistance. I hope we can continue to request your help whenever cases of international abduction to or from Pennsylvania are brought to our attention. Thank you again for your assistance.[8]

*See* Schuler Ltr. (June 1, 1994).

### C. The History of This Action

Plaintiff filed the complaint in this action on April 17, 1996 in the Eastern District of

---

**8.** Like Young's earlier letter, Schuler's letter contained a number of factual assertions that are inconsistent with the sworn testimony and other evidence in this case.

For example, Schuler states that "at the age of eight months [Oscar] was taken by his parents to Hungary." *See* Schuler Ltr. at 1. Egervary testified that Kovacs alone took Os-

Pennsylvania. It named Rooney, Burke, and Nallin (the "attorney defendants"), as well as Young and Schuler (the "federal defendants"). Count I alleged that the defendants violated plaintiff's due process rights under the Fifth Amendment by depriving him of custody of his child without notice or opportunity to be heard; Count II alleged that the defendants conspired to violate those rights.

The case was assigned to the Honorable E. Mac Troutman. By Memorandum and Order dated January 7, 1997, Judge Troutman found that venue was lacking in this District and gave plaintiff thirty days in which to move to transfer the case to the Middle District pursuant to 28 U.S.C. § 1406(a). *See Egervary I*, 1997 WL 9787, at *4–*5. Judge Troutman reasoned that venue would lie in this District, if at all, under 28 U.S.C. § 1391(b)(2), i.e., if "a substantial part of the events or omissions giving rise to the claim" occurred in this District. *Id.* at *4. Judge Troutman acknowledged that Rooney maintained his law offices in this District and that plaintiff alleged that the federal defendants had "contacted, encouraged, and directed" the attorney defendants in this District. *Id.* However, he did not find this alleged contact to be sufficiently substantial under § 1391(b)(2). *Id.* at *5. Pursuant to Judge Troutman's Order, plaintiff thereafter moved pursuant to § 1406(a) and the action was transferred.

In the Middle District, the case was assigned to Judge Nealon, who had heard the underlying ICARA petition. However, during a case management conference on December 11, 1997, Judge Nealon realized that he might be called as a witness and immediately recused himself. *See* Order (December 16, 1997). Thereafter, all of the remaining judges in the Middle District also recused themselves, and the Honorable Sue L. Robinson of the United States District Court for the District of Delaware was designated to preside over the case in the Middle District.

By Order dated August 17, 1998, Judge Robinson dismissed the federal defendants from the case because she concluded that plaintiff had not sufficiently alleged that

---

car to Hungary in February 1993, ostensibly so that she could perform in a concert, and that they were scheduled to return on April 6, 1993. *See* Egervary Aff. (July 7, 1994) ¶ 2. According to Egervary he had purchased a plane ticket to fly to Hungary and escort them back on that date. *Id.*

Schuler next states that: "The parents separated in the summer of 1993 and the mother was granted temporary custody by a Hungarian court pending the couple's divorce." *See* Schuler Ltr. at 1. In the next paragraph, he recounts the alleged abduction in December 1993. *Id.* at 2. The chronology of these events appears to be misleading. According to Egervary, Kovacs did inform him that their marriage was over in the summer of 1993. *See* Egervary Aff. (July 7, 1994) ¶ 2. However, Kovacs did not seek temporary custody from the Hungarian courts until after the alleged abduction. *See* Hungarian Order (December 22, 1993) (Exhibit A to the ICARA Petition of May 13, 1994). In fact, temporary custody was granted on December 22, 1993, four days after the alleged abduction. *Id.*

Schuler next states that: "At the time of his abduction, Oscar Egervary had lived for 10 months in Hungary and eight months in the United States." *See* Schuler Ltr. at 2. This claim ignores Egervary's contention that Kovacs began retaining Oscar in Hungary illegally as of May 1993 and hid the child from his father as of September 1993. *See* Egervary Aff. (June 9, 1994) ¶ 8; Egervary Aff. (July 7, 1994) ¶ 2.

Finally, Schuler asserts that "the parents had intended resettlement in Hungary." *See* Schuler Ltr. at 2. Egervary testified, however, that: "Although I moved some of my personal belongings from the United States to Hungary for use during that period, at no time did I plan to establish residency in Hungary, nor did I register with the Hungarian government as a resident." *See* Egervary Aff. (July 7, 1994) ¶ 2.

the proceedings before Judge Nealon were "in any way directed by, approved of, or even within the knowledge of" the federal defendants. *See* Order (August 17, 1998) at 5–6. With the federal defendants dismissed from the case, venue in the Eastern District became proper pursuant to 28 U.S.C. § 1391(b)(1). Therefore, upon unopposed motion by plaintiff, Judge Robinson transferred the case back to the Eastern District pursuant to 28 U.S.C. § 1404(a), and it was reassigned to me.

Prior to the close of discovery, the attorney defendants filed a motion for summary judgment arguing that: 1) Egervary's due process rights had not been violated; and 2) even if his rights had been violated he could not recover in a *Bivens* suit because of certain defenses (namely, waiver, collateral attack, lack of damages, and immunity). By Memorandum and Order dated January 21, 2000, I rejected these arguments. *See Egervary II*, 80 F.Supp.2d at 492. Specifically, I found that Egervary had a fundamental liberty interest in the custody of his son (*id.* at 498–99) and therefore could not be deprived of custody without either prior process (*id.* at 501–02) or a prompt, state-initiated postdeprivation hearing (*id.* at 502–04). I also noted that the essential facts necessary to establish a violation of his due process rights were not in contention. *Id.* at 509. I therefore ordered the attorney defendants to brief whether summary judgment should be entered against them on the question of liability on the *Bivens* claim. *Id.* at 510.

In response to that Order, the attorney defendants argued that: 1) they were not state actors and/or federal agents who could be held liable in a *Bivens* suit; and 2) even if they were federal agents, they could assert a good faith defense to liability that precluded the entry of summary judgment against them. By Memorandum and Order dated August 15, 2000, I accept-ed these arguments in part and rejected them in part. *See Egervary III*, 2000 WL 1160720. Specifically, I found that Nallin could not be held liable as a federal agent because he did not participate in executing the order that led to the deprivation of plaintiff's due process rights. *Id.* at *4–*6. Rooney and Burke, on the other hand, did participate in the execution of that order and therefore could be deemed federal agents for the purposes of *Bivens*. *Id.* at *5. However, given the Court of Appeals' decision in *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir.1994), I held that they could assert a good faith defense to liability. *Id.* at *6. I further concluded that whether they had acted in good faith was a jury question that precluded the entry of summary judgment in plaintiff's favor on the question of liability. *Id.*

After the summary judgment issues were resolved, Rooney and Burke were deposed for the first time. Rooney testified to a number of previously undisclosed facts regarding the federal defendants' alleged participation in the deprivation of plaintiff's due process rights. For example, Rooney testified that: 1) defendant Young asked Rooney to represent Kovacs, *see* Rooney Dep. at 55–56, and sent him Hungarian government documents regarding the alleged abduction and model ICARA pleadings (*id.* at 63–64); 2) while he was preparing the ICARA petition he consulted with the State Department "a bunch of times" (*id.* at 62); 3) someone from the State Department had called Judge Nealon's office that morning to inform the Court that a petition was going to be filed (*id.* at 120–21); 4) he spoke with Schuler while he was in Judge Nealon's chambers in order to confirm that the child could be removed from Egervary's custody and returned to Hungary without a hearing (*id.* at 115–16, 131–32); and 5) the State Department arranged for a waiv-

er of the child's passport so that he could be removed immediately from the country (*id.* at 165–66). On this basis, plaintiff argued that Rooney's testimony had undermined the rationale for Judge Robinson's earlier order dismissing the federal defendants from the case and moved for leave to file an amended complaint reasserting claims against them. I granted that motion on March 6, 2001. Thereafter, the federal defendants filed a motion for reconsideration arguing that leave to amend was not appropriate. I denied the motion for reconsideration on March 23, 2001:

> ... Rule 15 requires that leave to amend be freely given "when justice so requires." The federal defendants were dismissed from this case by Judge Robinson because she concluded that "plaintiff cannot prove that [the federal defendants] had any personal involvement in" the deprivation of plaintiff's due process rights. *See* Order dated August 17, 1998. There now is testimony that could give rise to a conclusion that these defendants were personally involved. Accordingly, I conclude that justice will be served by allowing the amendment.

*See* Order (March 23, 2001) at 3–4.

The amended complaint was filed on March 23, 2001. The federal defendants subsequently moved to dismiss the amended complaint, arguing that: 1) venue is lacking in this District; 2) the original complaint was not properly served; 3) the amended complaint is barred by the statute of limitations; and 4) they cannot he held liable because of the defense of qualified immunity. While the motion to dismiss was pending, the federal defendants filed a motion for summary judgment alleging that they had no personal involvement in the constitutional tort.[9]

## III. DISCUSSION

### A. Venue

The federal defendants first argue that the amended complaint should be dismissed for improper venue pursuant to Fed.R.Civ.P. 12(b)(5). Specifically, they argue that: 1) the law of the case doctrine precludes me from reconsidering Judge Troutman's 1997 finding that venue is lacking in this District; and 2) if considered on the merits, venue is lacking. I disagree.

#### 1. The Law of the Case Doctrine

■ The Court of Appeals has recognized that the law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Zichy v. City of Philadelphia,* 590 F.2d 503, 508 (3d Cir.1979), *quoting Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). "A judge need not follow a previous decision of the same issue in the same case if 'unusual circumstances' exist that permit a different conclusion." *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 169 (3d Cir.1982), *quoting Evans v. Buchanan,* 555 F.2d 373, 378 (3d Cir. 1977). One "commonly recognized exception ... exists if new evidence is available to the second judge when hearing the issue." *Id.* In such a situation, "the question has not really been decided earlier and is posed for the first time; the second judge ought, therefore, to be free to render a decision." *Id., quoting United*

---

9. In fact, the motion for summary judgment was filed on the same day as the federal defendants' reply brief in support of the motion to dismiss. I will cite the reply brief in support of the motion to dismiss as "Federal Defendants' Reply Br. (July 9, 2001)." I will cite the brief in support of the motion for summary judgment as "Federal Defendants' Br. (July 9, 2001)."

*States v. Wheeler*, 256 F.2d 745, 748 (3d Cir.1958).

 When Judge Troutman decided the venue question in 1997, he considered plaintiff's general allegation that "Rooney and Burke maintained their legal offices in this district, and as such, defendants Young and Schuler ... contacted, encouraged, and directed Rooney in this district." *See Egervary I*, 1997 WL 9787, at *4. He did not, however, have available to him the evidence since produced in discovery regarding the nature and extent of those contacts and how those contacts relate to the alleged due process violation. Specifically, Judge Troutman did not know that:

- Young contacted Rooney in his office in the Eastern District and asked him to represent Kovacs. *See* Rooney Dep. at 59–60. She later faxed him copies of model pleadings published by the American Bar Association and Hungarian government documents related to Kovacs' allegations. *Id.* at 62–64.

- While he was preparing the ICARA petition Rooney consulted with the State Department "a bunch of times" from his office in the Eastern District. *Id.* at 62;

- Rooney "relied" on the federal defendants' assistance in preparing the petition because he "was not extremely well-versed on The Hague." *Id.;*

- This reliance included finding out "where the child was" and establishing the facts to be presented in the petition. *Id.* at 62–63, 86–89. In fact, Rooney never spoke to Kovacs or her family prior to presenting the petition. *Id.* at 74; and

- After Rooney had taken custody of Oscar, he directed his associate Lori Mannicci, working from his office in the Eastern District, to make arrangements to remove the child from this country, including consulting with the State Department for a passport waiver. *Id.* at 156, 165–66; Mannicci Dep. at 8.[10]

This new evidence is sufficient to justify reconsideration of venue under the law of the case doctrine and, in my view, is sufficient to establish venue in this District.

### 2. A Substantial Part of the Events Giving Rise to the Claim

 As Judge Troutman observed, "it is clear that neither § 1391(b)(1) or § 1391(b)(3) applies in the present situation."[11] *Egervary I*, 1997 WL 9787, at *4. Venue must therefore be viewed under the requirements of § 1391(b)(2), which provides that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought only in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." This language reflects a 1990 amendment which "changed

---

10. Plaintiff also argues that Rooney "likely" transported Oscar through the Eastern District on their way to Newark International Airport. *See* Plaintiff's Br. (June 19, 2001) at 8. However, there is no specific testimony on this issue. Moreover, I take judicial notice that the most direct route from Cresco, PA (where Egervary resided) to Newark, NJ is via Interstate 80 in Monroe County, a route does not pass through the Eastern District. Therefore, I reject this argument.

11. Judge Troutman also observed that the venue provision of § 1391(e), which on its face would appear to govern this case, does not apply because of the Supreme Court's decision in *Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) (venue provision of § 1391(e) does not apply to actions for money damages against federal officials in their personal capacities). *See Egervary I*, 1997 WL 9787, at *4.

pre-existing law to the extent that the earlier version had encouraged an approach that a claim would generally arise in only one venue." *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994). In other words, "the statute no longer requires a court to select the 'best' forum." *Id.* "This expanded venue statute should be construed broadly." *Bowdoin v. Oriel,* No. 98–5539, 1999 WL 391486, at * 5 (E.D.Pa. May 5, 1999). "The defendant bears the burden of showing improper venue in connection with a motion to dismiss." *Myers v. Am. Dental Assoc.,* 695 F.2d 716, 725 (3d Cir.1982).

The federal defendants argue that the new evidence summarized above "adds nothing of significance" for the purposes of determining venue. They also argue that contacting the State Department for a passport waiver does not have "anything of significance to do with the alleged deprivation of plaintiff's right to due process." *See* Federal Defendants' Reply Br. (July 9, 2001) at 5–6 n. 3. I disagree.

Courts in this District have previously found that telephone calls that take place in this District can constitute events sufficient to establish venue in this District, even where "more substantial" events occurred outside of this District. *See, e.g., Nowicki v. United Timber Co.,* No. 99–257, 1999 WL 619648, at *1 n. 1 (E.D.Pa. Aug.12, 1999) (Yohn, J.) (contract negotiations via telephone sufficient to establish venue in this District even though contract was signed in New York and dealt with property located in the Middle District); *Bowdoin,* 1999 WL 391486, at *5 (Bartle, J.) (in diversity action between Florida and Massachusetts residents, venue was proper in the Eastern District because defendant had telephone conversations with

now-deceased, non-party co-conspirator who lived in the Eastern District). As was the case in *Nowicki* and *Bowdoin,* the telephone calls that took place in this District allegedly "gave rise to" the conduct that occurred outside of this District. *Cf.* 28 U.S.C. § 1391(b)(2). The gravamen of plaintiff's claim against the federal defendants is that they conspired with, gave substantial assistance or encouragement to, and/or ordered or induced Rooney to take custody of Oscar in violation of plaintiff's due process rights.[12] That conduct is alleged to have taken place by way of telephone calls to this District, and consistent with *Nowicki* and *Bowdoin* that is sufficient to establish venue under § 1391(b)(2).

Of particular importance to this conclusion is plaintiff's allegation that arrangements to have the child removed from this country without a passport were made in this District. The federal defendants imply that the removal of the child was irrelevant to the due process violation. However, as I noted in *Egervary II,* the immediate removal of the child consummated the due process violation by making a prompt, state-initiated postdeprivation hearing impossible. *See Egervary II,* 80 F.Supp.2d at 502 n. 7, *citing Weller v. Dep't of Soc. Servs.,* 901 F.2d 387, 396 (4th Cir.1990), and *Hooks v. Hooks,* 771 F.2d 935, 942–43 (6th Cir.1985). *See also infra* Part III–E–3–f.

I therefore conclude that a substantial part of the events giving rise to plaintiff's claim occurred in this District and venue is proper under § 1391(b)(2).

**B. Service of Process**

The federal defendants next argue that the amended complaint should be dis-

---

12. The characterization "conspired with, gave substantial assistance or encouragement to, and/or ordered or induced" tracks the requirements of Restatement (Second) of Torts §§ 876 and 877(a). *See infra* Part III–E–2.

missed for insufficient service of process pursuant to Fed.R.Civ.P. 12(b)(5). I disagree.

### 1. Rule 4 and Pa. R. Civ. P. 403

The starting point for this discussion is Rule 4(i)(2)(b), which states:

> Service on an officer or employee of the United States sued in an individual capacity for acts or omissions occurring in connection with the performance of duties on behalf on the United States— whether or not the officer or employee is sued also in an official capacity—is effected by serving the United States in the manner prescribed by Rule 4(i)(1) and by serving the officer or employee in the manner prescribed by Rule 4(e), (f), or (g).

The parties agree that the first part of this Rule was satisfied, i.e., plaintiff properly served the United States pursuant to Rule 4(i)(1) by sending copies of the summons and complaint to the United States Attorney for the Eastern District of Pennsylvania and the Attorney General of the United States. The parties disagree, however, about whether plaintiff properly effectuated personal service on the federal defendants pursuant to Rule 4(e), (f), or (g).

■ The federal defendants first raised the service issue in their motion to dismiss the original complaint in 1996. At that time, they argued that plaintiff had attempted to effect service under 28 U.S.C. § 1391(e)[13] when in fact he should have attempted to effect service under Pa. R.

Civ. P. 402(a)(1) & (2).[14] *See* Federal Defendants' Br. (August 7, 1996) at 34.

Plaintiff responded by arguing that he had not attempted service pursuant to § 1391(e). *See* Plaintiff's Br. (September 24, 1996) at 19. Instead, he argued, he had served the United States pursuant to Rule 4(i)(1) and had served the federal defendants personally pursuant to Rule 4(e)(1), which provides for personal service "pursuant to the law of the state in which the district court is located." *Id.* at 20–21. Specifically, he argued, he had personally served Young and Schuler pursuant to Pa. R. Civ. P. 403 by sending copies of the summons and complaint to their place of business by certified mail.

The federal defendants subsequently filed a reply brief but did not respond to plaintiff's argument. *See* Federal Defendants' Br. (October 18, 1996). Judge Robinson later granted the motion to dismiss but did not address the service of process issue.[15] *See* Order (August 17, 1998).

The federal defendants now renew the service of process argument, but their theory has changed. They now agree with plaintiff that the sufficiency of the personal service should be viewed in terms of Pa. R. Civ. P. 403. *See* Federal Defendants' Br. (May 11, 2001) at 13–14. They argue, however, that plaintiff failed to effect service pursuant to Pa. R. Civ. P. 403 because plaintiff cannot prove that an "agent" of the federal defendants signed the return receipt that accompanied the copies of the

---

**13.** Section 1391(e) permits service by certified mail upon federal officers sued in their official capacity. However, § 1391 does not apply to personal-capacity claims against federal officers (including *Bivens* claims). *See Stafford v. Briggs*, 444 U.S. 527, 542–45, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980).

**14.** The federal defendants did not explain why service could be effectuated pursuant to Pa. R. Civ. P. 402.

**15.** The motion to dismiss was filed in 1996 when the case was before Judge Troutman. However, because of the § 1406(a) transfer it was not decided until 1998 when the case was before Judge Robinson.

complaint sent to the federal defendants at their place of business.

Plaintiff initially responds by arguing that the federal defendants have waived the opportunity to challenge the sufficiency of process under Pa. R. Civ. P. 403 because the issue was not raised in the original motion to dismiss.[16] I disagree. Fed.R.Civ.P. 12(h)(1) provides that the defense of insufficient service of process is waived if it is not raised in the defendant's first responsive pleading or motion. Plaintiff has cited no support for the proposition that Rule 12(h)(1) requires every argument in support of the defense to be perfectly fleshed-out the first time it is stated. In my view, the federal defendants properly raised and preserved the defense and the latest version of their argument in support of the defense should be addressed on the merits.

I conclude, however, that the present record is insufficient to determine whether plaintiff has satisfied the Pennsylvania Rule. Pa. R. Civ. P. 403 provides:

> If a rule of civil procedure authorizes original process to be served by mail, a copy of the process shall be mailed to the defendant by any form of mail requiring a receipt signed by the defendant or his authorized agent. Service is complete upon delivery of the mail.

The Court of Appeals considered this provision in *Lampe v. Xouth, Inc.*, 952 F.2d 697 (3d Cir.1991). The *Lampe* Court found that "Pennsylvania Rule 403 requires ... a receipt signed by the defen-

dant or his authorized agent." *Id.* at 701. It went on to find that Rule 403 had not been satisfied in that case because the plaintiff had not proved that the signatures on the return receipts that had accompanied copies of the complaint and summons belonged to either the defendants or their agents. *Id.*

In this case, plaintiff has produced return receipts that were sent to the federal defendants' place of business and signed by someone named "L. [or possibly F.] Barton." *See* Plaintiff's Br. (June 19, 2001) at 15 n. 7; Affidavit of Gary L. Azorsky, Esq. (May 9, 1996) at Exhibits A and B. No party has offered any explanation as to who this individual is. I therefore cannot determine whether plaintiff has met the requirements of Pa. R. Civ. P. 403 as set out in *Lampe*.

### 2. 22 C.F.R. § 172.2

■ The parties differ on the appropriate course of action I should take if I find that I cannot decide whether plaintiff has satisfied Pa. R. Civ. P. 403. Plaintiff argues that "[a]t the very least, Mr. Egervary should be permitted to conduct limited discovery on the question of the identity of the signatory of the return receipt card, so as to be able to define that person's authority to accept service for the federal defendants." *See* Plaintiff's Br. (June 19, 2001) at 17. The federal defendants' only response to this request for limited discovery is to characterize it as "lame."[17] *See*

---

16. The federal defendants deny that their new theory is inconsistent with the theory presented to Judge Robinson in 1998. *See* Federal Defendants' Reply Br. (July 9, 2001) at 10 n. 7. As can clearly be seen from the summary of their arguments that appears above, that assertion is without merit.

17. I note that the federal defendants have made an additional argument that, while not made in response to the request for discovery,

would negate the need for discovery if accepted. They argue that Pennsylvania law does not permit service of process at an individual's place of employment. *See* Federal Defendant's Br. (May 11, 2001) at 15. This argument fails because the *Lampe* Court clearly implied that service by certified mail at the defendant's place of business would have been acceptable under Rule 403 if the return receipt had been signed by the defendant's

Federal Defendant's Reply Br. (July 9, 2001) at 12.

In my view, however, discovery is not the appropriate course of action because service can be perfected promptly. Allowing plaintiff to perfect service is consistent with the Rules and case law. Rule 4(i)(3)(A) provides that a court "shall allow a reasonable time to serve process under Rule 4(i) for the purpose of curing the failure to serve . . . all persons required to be served." Similarly, Rule 4(m) provides that a court "shall extend the time for service for an appropriate period" if the plaintiff shows "good cause" for the failure to serve within the prescribed period. Here, the federal defendants' failure to raise the Rule 403 theory until five years after service was attempted constitutes "good cause." Similarly, the Court of Appeals has stated that:

> Upon determining that process has not been properly served on a defendant, district courts possess broad discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply quash service of process. However, dismissal of a complaint is inappropriate when there exists a reasonable prospect that service may yet be obtained.

*See Umbenhauer v. Woog,* 969 F.2d 25, 30 (3d Cir.1992). For the following reasons, I find that there is more than a "reasonable prospect" that proper service may yet be obtained.

■ The federal defendants have repeatedly quoted a portion of 22 C.F.R. § 172.2 for the proposition that "the [State] Department is not an authorized agent for service of process with respect to civil litigation against Department employ-

ees purely in their personal, non-official capacity." *See* Federal Defendants' Br. (May 11, 2001) at 15; Federal Defendants' Reply Br. (July 9, 2001) at 12. This portion of § 172.2 is not relevant to this case. Plaintiff has not made claims against the federal defendants "purely in their personal, non-official capacity." Rather, plaintiff has made claims against them "in an individual capacity for acts or omission occurring in connection with the performance of duties on behalf of the United States." *Cf.* Fed.R.Civ.P. 4(i)(2)(B).

However, the remainder of § 172.2, to which the federal defendants have not referred, does apply to this case. It states: "[T]he Executive Office of the Legal Adviser (L/EX) is authorized to receive and accept summonses or complaints sought to be served upon the Department or Department employees." *See* 22 C.F.R. § 172.2(a). The regulation goes on to state, in the sentence immediately following the one quoted by the federal defendants, that: "Copies of summonses or complaints directed to Department employees in connection with legal proceedings arising out of the performance of official duties may . . . be served upon L/EX." [18] *See* 22 C.F.R. § 172.2(c).

I will therefore deny the federal defendants' motion to dismiss pursuant to Rule 12(b)(5) and allow the plaintiff to perfect service pursuant to 22 C.F.R. § 172.2 within 30 days.

### C. Statute of Limitations

The federal defendants next argue that the amended complaint is barred by the statute of limitations. I disagree.

---

authorized agent. *See Lampe,* 952 F.2d at 701.

**18.** The regulation also states that: "All such documents should be delivered or addressed to The Executive Office, Office of the Legal Adviser, room 5519, United States Department of State, 2201 C Street, NW, Washington, DC 20520–6310." *See* 22 C.F.R. § 172.2(a).

■ The federal defendants concede that plaintiff filed the first complaint within the two year statute of limitations for *Bivens* actions in Pennsylvania.[19] They argue, however, that the amended complaint was filed after the limitations period had run and that "a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice." *See* Federal Defendants Br. (May 11, 2001) at 17, *quoting Cardio–Medical Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 77 (3rd Cir.1983).[20]

### 1. Rule 54(b)

In the cases relied upon by the federal defendants, the first complaint had been dismissed without prejudice and a new complaint was filed in a separate action. In such situations, a statute of limitations is not tolled by the filing of the first complaint. Here, however, the complaint was dismissed with prejudice as to two defendants but survived as to the remaining defendants. This situation is expressly covered by Rule 54(b):

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, *or when multiple parties are involved,* the court may direct the entry of a final judgment as to one or more but fewer than all of the claims *or parties* only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all claims or the rights and liabilities of *fewer than all the parties* shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

Fed.R.Civ.P. 54(b) (emphasis added). Because no final judgment was entered after Judge Robinson's dismissal order, the action did not terminate as to the federal defendants and Judge Robinson's order was "subject to revision at any time." *Id.*

In order to avoid the obvious impact of Rule 54(b) on their statute of limitations argument, the federal defendants argue that Judge Robinson's dismissal order was never "revised" within the meaning of the Rule:

> A fundamental problem with plaintiff's theory is that he never sought to have the court revise Judge Robinson's decision dismissing the Federal Defendants from the case and the Court never determined that, given the facts presented in plaintiff's original complaint, Judge Robinson's ruling was in error or subject to revision.

*See* Federal Defendant's Reply Br. (July 9, 2001) at 14.

This argument lacks merit. As I stated in my Order of March 23, 2001:

> ... Rule 15 requires that leave to amend be freely given "when justice so

---

**19.** The statute of limitations for a *Bivens* action is the statute of limitations for personal injuries in the state where the tortious act occurred. *See Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1087–88 n. 3 (3d Cir.1988). Under Pennsylvania law, an action for personal injuries must be commenced within two years of the accrual of the cause of action. *See* 42 Pa. C.S.A. § 5524.

**20.** Curiously, however, they concede that plaintiff could still appeal Judge Robinson's dismissal of the first complaint. *Id.* at 19 n. 10. If plaintiff prevailed in that appeal, the federal defendants thereafter would be required to litigate the same issues they currently face.

requires." The federal defendants were dismissed from this case by Judge Robinson because she concluded that "plaintiff cannot prove that [the federal defendants] had any personal involvement in" the deprivation of plaintiff's due process rights. *See* Order dated August 17, 1998. There is now testimony that could give rise to a conclusion that these defendants were personally involved. Accordingly, I conclude that justice will be served by allowing the amendment.

*See* Order (March 23, 2001) at 3–4.

The federal defendants are correct that I never held that "Judge Robinson's ruling was in error"; however, I need not make such a determination. Viewing the newly discovered evidence in the light most favorable to plaintiff, it can no longer be said that the proceedings before Judge Nealon were not "in any way directed by, approved of, or even within the knowledge of the [federal defendants]." *Cf.* Order (August 17, 1998) at 5–6. Nothing in Rule 54(b) states or implies that a valid "revision" of an "order or other form of decision" dismissing fewer than all of the parties cannot be made unless the court concludes that the order was in error at the time it was entered.[21] Judge Robinson's order did not terminate the action against the federal defendants and the amended complaint is not barred by the statute of limitations if it relates back to the original complaint.

2. Rule 15(c) and the Relation Back Doctrine

 Rule 15(c)(2) states: "An amendment of a pleading relates back to the date

of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." This provision means what it says:

> [A]mendments that merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the Rule 15(c) test and will relate back. Thus, amendments that do nothing more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within Rule 15(c).

*See* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1497 (2d ed.1990).

Rule 15(c)(2) obviously applies to the amended complaint in this case, which merely restates the allegations of the original complaint with greater particularity. The federal defendants do not discuss Rule 15(c)(2) in their initial brief, and the discussion in their reply brief is limited to the following passage:

> Plaintiff argues that his claims against the Federal Defendants in the Amended Complaint relate back to the filing of the original complaint under Rule 15(c)(2) of the Federal Rules of Civil Procedure because the Amended Complaint did not change "the party or the naming of the party" against who [sic] the claim is asserted. *See* Plaintiff's Brief at 28–29. Plaintiff further argues that even if Rule

---

21. Moreover, the federal defendants' argument that a court cannot make a valid revision of an order under Rule 54(b) unless it finds that the order was wrong when decided makes little sense when Rule 54(b) is read *in para materia* with Rule 60(b), which provides, *inter alia,* for relief from a final judgment on the basis of newly discovered evidence. If the federal defendants' view were correct, an unsuccessful plaintiff with newly discovered evidence could seek relief from a final judgment under Rule 60(b) but could not seek to revise a non-final dismissal order under Rule 54(b).

15(c)(3) of the Federal Rules of Civil Procedure is applicable, his amended complaint relates back to the filing of the original complaint because there was a "mistake" in the naming of the party. *Id.* at 29–31. Plaintiff is wrong on both counts.

*See* Federal Defendants' Reply Br. (July 9, 2001) at 16. Rule 15(c)(2) is never mentioned again, however, and the reader is left wondering why "plaintiff is wrong on [that] count." *Id.* Instead, the federal defendants embark on a three page discussion of Rule 15(c)(3).[22] There are, however, two problems with their discussion.

First, Rule 15(c)(3) does not apply to this situation. Rule 15(c)(3) applies to an "amendment [that] changes the party or the naming of the party against whom a claim is asserted." The Advisory Committee notes illustrate the circumstances where the Rule applies:

> The problem has arisen most acutely in certain actions by private parties against officers or agencies of the United States. Thus an individual denied social security benefits by the Secretary of Health, Education, and Welfare may secure review of the decision by bringing a civil action against that officer within sixty days. 42 U.S.C. § 405(g) (Supp.III, 1962). In several recent cases the claimants instituted timely action but mistakenly named as defendant the United States, the Department of HEW, the "Federal Security Administration" (a nonexistent agency), and a Secretary who had retired from office nineteen days before.

Discovering their mistakes, the claimants moved to amend their complaints to name the proper defendant; by this time the statutory sixty-day period had expired. The motions were denied on the ground that the amendment "would amount to the commencement of a new proceeding and would not relate back in time so as to avoid the statutory provision ... that suit be brought within sixty days."

*See* Fed.R.Civ.P. 15 Advisory Committee Notes (1966 Amendment). The present case is not such a situation. Yet, the federal defendants argue that "plaintiff offers no explanation of his assertion that his amended complaint did not change 'the party or the naming of the party' against whom a claim is made." *See* Federal Defendants' Reply Br. (July 9, 2001) at 16. This argument is incomprehensible for two reasons. First, the explanation is self-evident. The original complaint named Virginia Young and James Schuler. *See* Complaint ¶¶ 2, 3. The amended complaint also names Virginia Young and James Schuler. *See* Amended Complaint ¶¶ 2, 3. Second, the federal defendants themselves have previously stated that "[h]ere, there was no mistake concerning the identity of the Federal Defendants; plaintiff Egervary brought suit against the Federal Defendants in his original Complaint." *See* Federal Defendants' Br. (May 11, 2001) at 20.

Second, even if Rule 15(c)(3) did apply to this case, plaintiff has met the requirements of that Rule. In most circumstances,

---

**22.** Rule 15(c)(3) provides:

> An amendment of a pleading relates back to the date of the original pleading when ... the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

a plaintiff invoking Rule 15(c)(3) must prove that the newly named party "(A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." *See* Fed.R.Civ.P. 15(c)(3). However, these requirements generally do not apply to federal defendants. The Rule goes on to state that:

> The delivery or mailing of process to the United States Attorney, or United States Attorney's designee, or the Attorney General of the United States, or an agency or officer who would have been a proper defendant if named, satisfies the requirement of subparagraphs (A) and (B) of this paragraph (3) with respect to the United States or any agency or officer thereof to be brought into the action as a defendant.

*See* Fed.R.Civ.P. 15(c).

The federal defendants admit plaintiff correctly and timely served the United States Attorney for the Eastern District of Pennsylvania and the United States Attorney General. *See* Federal Defendants' Br. (May 11, 2001) at 11. Yet, rather than acknowledging that that service relieved plaintiff from the requirements of Rule 15(c)(3)(A) and (B), the federal defendants ignore the provision quoted above and engage in an extended discussion of Rule 15(c)(3)(B).[23] *See* Federal Defendants' Br. (May 11, 2001) at 19–20; Federal Defendants' Reply Br. (July 9, 2001) at 16–18.

I conclude that the amended complaint relates back to the original complaint pursuant to Rule 15(c)(2).

### 3. Equitable Estoppel

■ Finally, even if Rules 15(c)(2) and 54(b) did not apply, I would hold that the federal defendants are equitably estopped from asserting the statute of limitations because of their concealment of their personal involvement in this case.

■ Under Pennsylvania law, a defendant is estopped from invoking the statute of limitations where "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry." *Schaffer v. Larzelere*, 410 Pa. 402, 189 A.2d 267, 269 (1963). The defendant's conduct "need not rise to the level of fraud or concealment in the strictest sense, that is an intent to deceive; unintentional fraud or concealment is sufficient." *Krevitz v. City of Philadelphia*, 167 Pa.Cmwlth. 412, 648 A.2d 353, 357 (1994). Courts have held, however, that "[m]ere mistake, misunderstanding or lack of knowledge is not sufficient to toll the running of the statute." *Schaffer*, 189 A.2d at 269. Moreover, "mere silence or nondisclosure is not enough to trigger estoppel." *Krevitz*, 648 A.2d at 357. Rather, the adversary "must commit some affirmative independent act of concealment upon which the plaintiffs justifiably rely in order to toll the statute." *Id.* A court may find an estoppel "only in clear cases of fraud, deception, or concealment" and plaintiff has the burden of making such a showing. *Belfi Brothers & Co. v. Safeco Ins. Co. of Am.*, No. 94–0844, 1994 WL 591762, at *4 (E.D.Pa. Oct.28, 1994).

---

**23.** Although they never so state explicitly, the federal defendants' preoccupation with Rule 15(c)(3) seems to be based on the incorrect assumption that a plaintiff must satisfy all three subsections of Rule 15(c) in order for an amendment to relate back. The text of Rule 15(c) clearly states, however, that an amendment relates back if it satisfies subsection (1), (2), or (3), though subsection (3) subsumes the requirements of subsection (2).

In my view, the federal defendants concealed their personal involvement in this case when in response to the original complaint they immediately moved to stay discovery, an affirmative act, and dismiss the complaint. In that motion, they argued that plaintiff had failed "to substantiate his claims with a single fact showing that defendants Young and Schuler, or any other State Department official, had any involvement in the removal of the child without notice." *See* Federal Defendants' Br. (August 7, 1996) at 10. On this basis, Judge Robinson concluded that "plaintiff cannot prove that the moving defendants had any personal involvement in, nor did they conspire to, deprive plaintiff of his right to due process." *See* Order (August 18, 1998) at 6. Yet, discovery had since yielded more than "a single fact" that arguably shows that the federal defendants were personally involved in the events of this case:

- Young contacted and retained Rooney on behalf of Kovacs. *See* Rooney Dep. at 59–60. She later faxed him Hungarian government documents and copies of model ICARA pleadings published by the American Bar Association. *Id.* at 62–64.

- Rooney "relied" on the federal defendants' assistance in drafting the petition presented to Judge Nealon and spoke to them about it "a bunch of times." *See* Rooney Dep. at 62. He never, on the other hand, spoke with his client, Kovacs, or any member of her family in order to prepare the petition. *Id.* at 74. The factual representations he later made to Judge Nealon were based entirely on conversations with the federal defendants and the Hungarian government documents that he received from the federal defendants. *Id.* at 86–89.

- The federal defendants contacted Judge Nealon's chambers on May 13,

1994 to inform the Court that a Hague Convention petition would be presented that day. *Id.* at 120–21.

- During the presentation to Judge Nealon, Rooney called the State Department and spoke with James Schuler to confirm that Judge Nealon could order that the child be returned to Hungary immediately. *Id.* at 115–16, 131–32. Rooney also called them thereafter from the Marshal's office and on the road to Newark. *See* Burke Dep. at 70–71. He was "continuously in conversation" with them that day. *Id.*

- After the child had been taken from plaintiff's custody, the State Department arranged for a passport waiver so that the child could be removed from the country that same day. *See* Rooney Dep. at 165–66. *See also* Mannicci Dep. at 19, 22–23, 30–31.

The federal defendants did not literally misrepresent the extent of their involvement to Judge Robinson, i.e., they did not specifically deny that they had any personal involvement. Rather, they argued that claims against government officials are subject to a heightened pleading standard and plaintiff had failed to meet that standard. *See* Federal Defendants' Br. (August 7, 1996) at 16–27. However, in order for equitable estoppel to apply their conduct "need not rise to the level of fraud or concealment in the strictest sense." *Krevitz*, 648 A.2d at 357. The federal defendants effectively hid behind the heightened pleading standard, causing plaintiff to do more than just "relax his vigilance." *See Schaffer*, 189 A.2d at 269. As a result of the federal defendants' strategy, plaintiff was forced to "deviate from his right of inquiry" by operation of a court order that at their request initially stayed discovery and later led to dismissal of the complaint. *Id.*

The federal defendants respond to this conclusion by arguing the following:

> In their original motion to dismiss, the Federal Defendants argued, as they plainly were entitled to do, that the plaintiff's complaint, on its face, failed to sufficiently state a claim against them for violation of constitutional rights. They also argued, as they were plainly entitled to do, that discovery was not appropriate because they had raised the defense of qualified immunity. These perfectly legitimate arguments by the Federal Defendants cannot form the basis for some claim of fraud or concealment sufficient to justify equitable estoppel or equitable tolling.

See Federal Defendants' Reply Br. (July 9, 2001) at 21.

I agree with the premise of this argument but disagree with the conclusion. Certainly, the federal defendants had the right to assert that a heightened pleading standard applied to plaintiffs' claim. Equity, however, should not allow them to benefit from a strategy that delayed the discovery of evidence of their personal involvement.

I therefore conclude that the amended complaint is not barred by the statute of limitations.

### D. Qualified Immunity

The federal defendants next argue that they are entitled to qualified immunity.[24] I disagree.

▉▉▉ Under the qualified immunity doctrine, government officials performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court has directed courts evaluating claims of qualified immunity to proceed in two steps: a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 608, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

#### 1. Due Process Violation

The Due Process Clause of the Fifth Amendment states that no person shall "be deprived of life, liberty, or property without due process of law." *See* U.S. Const. amend. V. "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Neither of these "fundamental requisite[s]" of due process is satisfied by mere pretense. *Id.* at 314, 70 S.Ct. 652. Notice must be "reasonably calculated, under all the circumstances, to apprise inter-

---

**24.** The federal defendants originally raised this issue in their motion to dismiss. However, they later supplemented that analysis in their motion for summary judgment. *See* Federal Defendants' Br. (July 9, 2001) at 14–17. I will therefore address the qualified immunity issue under the summary judgment standard. *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."). *See also infra* Part III–E–1.

ested parties of the pendency of the action" (*id.*), and the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

Procedural due process questions are examined in two steps. *See Kentucky Dep't. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The first step "asks whether there exists a liberty interest which has been interfered with by the State." *Id.* If there is such an interest, the second step asks "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.*

### a. Liberty Interest

■ An abundance of case law supports the conclusion that plaintiff had a fundamental liberty interest in the custody of his child. *See Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, the mother had "a constitutionally protected liberty interest [in the custody of her children] which could not be deprived without due process"); *Jordan v. Jackson,* 15 F.3d 333, 342 (4th Cir.1994) (in a Section 1983 suit brought by parents whose son was removed from their custody without prior notice, the court found that there "are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate"); *Weller v. Dep't. of Soc. Servs.,* 901 F.2d 387, 391 (4th Cir.1990) (in a Section 1983 suit brought by a father whose children were removed from his custody without prior notice, the father "clearly [had] a protectible liberty interest in the care and custody of his children");

*Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, "it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected interest of which he or she could not be deprived without due process"); *Hooks v. Hooks,* 771 F.2d 935, 941 (6th Cir.1985) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, the court found that it is "well-settled that parents have a liberty interest in the custody of their children"); *Lossman v. Pekarske,* 707 F.2d 288, 290 (7th Cir.1983) (in a Section 1983 suit brought by a father whose children were removed from his custody without prior notice, the father "unquestionably" had a liberty interest in the custody of his children); *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, the court found a liberty interest in "the most essential and basic aspect of familial privacy, the right of the family to stay together without the coercive interference of the awesome power of the state").

It is also clear that plaintiff had a fundamental liberty interest in the custody of his son even though his estranged wife contested legal custody. Courts have recognized a parent's liberty interest in the physical custody of a child even when the parent lacks legal custody. For example, in *Farina v. City of Tampa,* 874 F.Supp. 383 (M.D.Fla.1994), prospective adoptive parents sued the city police after officers returned the child to his biological parents without any prior notice or judicial proceedings. *Id.* at 384–85. The defendants conceded the underlying facts and acknowledged that the operative law provided for notice and opportunity to be heard

before custody decisions are made. *Id.* at 385. Defendants argued, however, that plaintiffs had no protected liberty interest because they had only physical, not legal, custody of the child. The court flatly rejected that distinction and found "no authority in support of [defendants'] distinction between physical and legal custody for procedural due process purposes." *Id.* at 386. On this basis, the court granted partial summary judgment in favor of the plaintiffs. *Id.* at 387.

Plaintiff therefore had a fundamental liberty interest in the continued physical custody of his son.

#### b. The Constitutional Sufficiency of the Process

Since Egervary had a fundamental liberty interest in the custody of his son, the child could not be removed from his custody without either prior process or a prompt, state-initiated postdeprivation hearing.

Obviously, plaintiff's due process rights would not have been violated if he had received notice and opportunity to be heard prior to Oscar's removal from his custody. However, "due process is flexible and calls for such procedural protections as the particular situations demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). For this reason, courts have found that even though parents have a fundamental liberty interest in the custody of their children they do not always have a right to prior process when the state removes their children from their custody.

■ Courts agree that "in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order." *Hollingsworth*, 110 F.3d at 739. *See also Jordan*, 15 F.3d at 343 (parents can be deprived of custody of their children without prior process "where emergency action is necessary to avert imminent harm to a child"); *Weller*, 901 F.2d at 393 ("Due process does not mandate a prior hearing where emergency action may be needed to protect a child."); *Doe v. Hennepin County*, 858 F.2d 1325, 1329 (8th Cir.1988) (the state may intervene on behalf of "abused children" without prior notice); *Robison*, 821 F.2d at 921 ("officials may temporarily deprive a parent of custody in 'emergency' circumstances"); *Lossman*, 707 F.2d at 291 ("When a child's safety is threatened, that is justification enough for action first and hearing afterwards."); *Duchesne*, 566 F.2d at 826 (child can be removed without prior process in "extraordinary situations").

■ It is not clear whether the facts in this case justified Oscar's removal without prior process. In each of the cases cited above where an emergency removal was found to be justified, there was specific evidence of an imminent threat of severe neglect or physical abuse. *See Jordan*, 15 F.3d at 336 (neglect); *Weller*, 901 F.2d at 391 n. 7 (physical abuse); *Doe*, 858 F.2d at 1326 (sexual abuse); *Robison*, 821 F.2d at 916 (sexual abuse); *Lossman*, 707 F.2d at 289 (physical abuse and death threats); *Duchesne*, 566 F.2d at 822 (neglect). By contrast, in *Hollingsworth*, where there were merely general allegations of "abuse, injury, molestation, and harassment" but no concrete evidence of an "immediate threat," the removal without prior process was found to be unjustified. *See Hollingsworth*, 110 F.3d at 740. In this case, plaintiff was accused of kidnaping his son, a serious offense that arguably involves an inherent risk of further flight. It is unclear, however, whether the bare allegation of parental kidnaping is serious enough to justify emergency action to remove a child from his parent's custody without prior

process. I need not resolve this issue because plaintiff was also denied a prompt, state-initiated postdeprivation hearing.

■ Even when an imminent threat of harm justifies removing a child from his parent's custody without prior process, there must be a prompt, state-initiated postdeprivation hearing to ratify the removal.[25] *See Jordan*, 15 F.3d at 343 ("[T]he requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, provided that post-deprivation process to ratify the emergency action is promptly accorded."); *Weller*, 901 F.2d at 396 ("[E]ven if it is constitutionally permissible to temporarily deprive a parent of the custody of a child in an emergency, the state has the burden to initiate prompt judicial proceedings to ratify its emergency action."); *Hennepin County*, 858 F.2d at 1329 ("[T]he state may intervene on behalf of abused children ... if the state provides an adequate postdeprivation hearing."); *Lossman*, 707 F.2d at 291

("[W]here the state has a procedure for a prompt, adversary postdeprivation hearing in a child custody matter and the hearing is held and establishes that the state officers acted prudently in removing the child from the parent's custody without a prior hearing, that finding extinguishes a claim that the failure to hold a predeprivation hearing was a denial of due process."); *Duchesne*, 566 F.2d at 826 ("[I]n those 'extraordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed.").

The federal defendants have not attempted to argue that plaintiff received either a prior hearing or a prompt, state-initiated postdeprivation hearing.[26] I therefore conclude that plaintiff's due process rights were violated and the federal defendants can be held liable for that violation unless there was no clearly established right at the time of the violation.[27]

**25.** In *Egervary II*, 80 F.Supp.2d at 502–04, I discussed at length the standard for deciding whether a postdeprivation hearing is sufficiently prompt to satisfy due process and the rationale for why a postdeprivation hearing must be initiated by the state.

**26.** In *Egervary II*, I considered and rejected the attorney defendants' argument that Egervary's motion for reconsideration filed before Judge Nealon and the later custody proceedings in Hungary satisfied the requirement of a prompt, state-initiated post-deprivation hearing. *See Egervary II*, 80 F.Supp.2d at 502–04.

**27.** Although it is not necessary to show actual prejudice in order to make a due process claim, I note that plaintiff had potentially compelling arguments that may have changed the outcome of the ICARA proceedings if he had been afforded an opportunity to be heard. As I explained in *Egervary II:*

Mr. Egervary had compelling, though not necessarily dispositive, arguments that could have been presented if he had been

afforded notice and opportunity to be heard.

First, Mr. Egervary maintains that Ms. Kovacs took Oscar out of this country under false pretenses and then refused to return him. *See generally* Egervary Supplemental Aff. ¶ 2. If these allegations are true, then Ms. Kovacs likely violated the Hague Convention by unlawfully retaining Oscar outside of the country of his habitual residence.

Second, Mr. Egervary could have argued that the Hague Convention did not apply to Ms. Kovacs' claim because Hungary was not Oscar's habitual residence. Under ICARA, Ms. Kovacs had the burden of proving by a preponderance of evidence that Hungary was Oscar's habitual residence. *See* 42 U.S.C. § 11602(e). In *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995), the Court of Appeals defined "habitual residence" as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose'

## 2. Clearly Established Right

The federal defendants are entitled to qualified immunity if they did not violate a "clearly established" right "of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. The "contours" of the asserted right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Some factual correspondence" to precedent is necessary, but "it is not necessary that there have been a previous precedent directly in point." *Good v. Dauphin County Soc. Servs. for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir.1989). "Thus, government officials are not barred from the protection of qualified immunity if they fail to predict fluctuations in legal debates. They will not, however, be granted immunity if they fail to make obvious inferences from a generally established right, to its application in particular situations." *Doe v. Delie*, 257 F.3d 309, 331 (3d Cir.2001) (Nygaard, J., concurring in part and dissenting in part). "In sum, an official will not be liable for allegedly unlawful conduct so long as his actions are objectively reasonable under current federal law." *Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir.2000).

### a. Federal Law as of May 1994

I conclude that plaintiff's right to due process was clearly established at the time of the alleged violation in May 1994 because there was a consensus among federal appellate courts that a parent is entitled to notice and opportunity to be heard in a situation like the present one. Of the numerous appellate court decisions cited in the previous section, only two, *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir.1997) and *Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir.1994), were decided after the events in this case. Therefore, if the federal defendants were reasonably cognizant of federal constitutional law in May 1994, as the qualified immunity defense

---

from the child's perspective." The "shared intentions" of both the parents are relevant to this inquiry. *Id.* The *Feder* Court also specifically criticized a district court decision that found Germany was a child's habitual residence after "what began as a voluntary visit" to that nation turned into a "coerced residence." *Id.* at 224–25, discussing *In re Application of Ponath*, 829 F.Supp. 363 (D.Utah 1993). Consistent with *Feder*, Mr. Egervary could have argued that Oscar never experienced a degree of settled purpose in Hungary because he lived there for such a short time and was frequently moved around the country because of his mother's attempt to hide the child from his father. In addition, Oscar's parents never had a shared intention of residing in Hungary. Oscar was in Hungary only because his mother took him there, and she may have taken him there under false pretenses. Also relevant to this inquiry is the fact that Oscar is a United States citizen and at that point had spent the overwhelming majority of his life here.

Finally, even if the court rejected these arguments, Mr. Egervary would have had the opportunity to prove by clear and convincing evidence that Oscar's return would expose the child to "physical or psychological harm or otherwise place the child in an intolerable situation." *See* 42 U.S.C. § 11603(e)(2)(A); Hague Convention, Article 13. Specifically, Mr. Egervary could have developed the evidence that when he found his son in Hungary in December 1993 the boy "appeared undernourished" and wore "dirty and ragged" clothing. *See* Egervary Aff. ¶ 9.

The Court makes no finding as to whether Mr. Egervary would have prevailed on any of these arguments. Such a finding would not be possible without a full evidentiary hearing and is likely irrelevant to this case. It is nonetheless clear that plaintiff was deprived of any opportunity to present these arguments.

*See Egervary II*, 80 F.Supp.2d at 500–01.

requires them to be, they should have been aware of the following.

In 1977, in *Duchesne v. Sugarman*, 566 F.2d 817, 821–22 (2d Cir.1977), a mother brought a § 1983 claim on behalf of herself and her two minor children against four supervisory level municipal welfare employees and two private child care institutions. The mother alleged that the defendants had violated her due process rights by taking custody of her children without notice or opportunity to be heard. *Id.* at 824. The court concluded that the initial taking of the children was lawful because there was an imminent threat of neglect, the mother having been confined to a psychiatric hospital. *Id.* at 825–26. It also held that defendants violated the mother's due process rights because there was no prompt, state-initiated postdeprivation hearing. *Id.* at 828. The state defendants raised the defense of qualified immunity, but the court remanded the case so that the district court could address the issue initially. *Id.* at 829–30.

In 1983, in *Lossman v. Pekarske*, 707 F.2d 288, 289 (7th Cir.1983), a father brought a § 1983 claim on behalf of himself and his three minor children against county welfare and law-enforcement officers. The father alleged that the defendants had violated his due process rights by taking custody of his children without notice or opportunity to be heard. *Id.* at 289–90. The court concluded that the father had an fundamental liberty interest in the custody of his children and, therefore, they could not be removed from his custody without notice or opportunity to be heard. *Id.* at 290–91. It found, however, that the father had received due process in the form of a prompt, state-initiated postdeprivation hearing. *Id.* at 291–92. It therefore affirmed the district court's grant of summary judgment in favor of the defendants. *Id.* at 292.

In 1985, in *Hooks v. Hooks*, 771 F.2d 935, 937–38 (6th Cir.1985), a mother brought a § 1983 claim against her former husband, his parents, two of his friends, officers and employees of a county sheriff's department, and an employee of the state Department of Human Services. The mother alleged that the defendants had violated her due process rights by taking custody of her two minor children without notice or opportunity to be heard. *Id.* at 938. The court concluded that the mother had stated a claim for violation of her due process rights, at least in part because the children had been removed from her custody and immediately taken to another state, "effectively eliminating the opportunity for plaintiff to receive a post-deprivation hearing." *Id.* at 942. The court also discussed the extent to which co-conspirators could be held liable to the mother:

> Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id.* at 944. On this basis, the court found that the mother could not maintain a claim against her ex-husband's friends and parents because they were not alleged to have had knowledge of the conspiracy. *Id.* However, the court allowed the case to continue as to the remaining defendants. *Id.*

In 1987, in *Robison v. Via*, 821 F.2d 913, 915 (2d Cir.1987), a mother brought a § 1983 claim against a state trooper and an assistant state's attorney. The mother alleged that the defendants had violated

her due process rights by taking custody of her two minor children without notice or opportunity to be heard. *Id.* at 917. In analyzing the defendants' qualified immunity defense, the court stated the following:

> To be sure, in 1981, when the Robison children were taken into custody, it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected liberty of which he or she could not be deprived without due process, which would generally require a predeprivation hearing ... However, it was, and remains, equally well established that officials may temporarily deprive a parent of custody in emergency circumstances without parental custody or a prior court order.

*Id.* at 921. The court went on to conclude that due process had been satisfied because there were credible allegations of sexual abuse that justified emergency removal of the child and there was a prompt, state-initiated postdeprivation hearing the next day. *Id.* at 922.

In 1990, in *Weller v. Dep't. of Soc. Servs.*, 901 F.2d 387, 389 (4th Cir.1990), a father brought a § 1983 claim against twenty-five defendants, including "agencies of Maryland, employees of the State of Maryland and the City of Baltimore, and his ex-wife and mother-in-law." The father alleged that the defendants had violated his due process rights by taking custody of his minor son without notice or

opportunity to be heard. *Id.* at 393. The court held that "a parent is entitled to a hearing initiated by the State before he may be deprived of the custody of his child, and in an emergency a prompt hearing may ratify the state action." *Id.* at 398. It also expressed "additional concern" because the defendants had immediately taken the son to a different jurisdiction, "thereby reducing the possibility of a post-deprivation hearing." *Id.* at 396. The court acknowledged, however, that the defendants could assert qualified immunity and therefore remanded the case to the district court to determine whether the right had been clearly established at the time of the alleged deprivation. *Id.* at 398.

These precedents establish more than just the "contours" of the right that was allegedly violated; they are a well-marked roadmap.[28] All of the cases agree that a parent has a fundamental liberty interest in the custody of his or her child. All of the cases agree that that interest cannot be infringed upon without either prior process or, in the case of an emergency, a prompt, state-initiated postdeprivation hearing. Two of the cases, *Duchesne* and *Weller*, implicitly illustrate that liability for such an unconstitutional deprivation can extend further than the individual who physically takes custody of the child, and a third case, *Hooks*, explicitly describes the limits of conspiratorial liability for such a deprivation. Two of the cases, *Duchesne* and *Weller*, declared that the asserted right exists but remanded to the district court to determine whether it had been

**28.** In addition to these appellate decisions, a number of district courts and state courts have arrived at similar conclusions in decisions that predate the events in this case. *See, e.g., Rubin v. Smith,* 817 F.Supp. 987 (D.N.H.1993) (mother stated cause of action under § 1983 for a procedural due process violation where her daughter was taken from her custody after a temporary custody hearing in another state of which she was given no

notice or opportunity to be heard); *Roe v. Borup,* 500 F.Supp. 127, 130 (E.D.Wis.1980) ("Deprivation of child custody without a court hearing has been held to state a cause of action under section 1983 for a procedural due process violation."); *Olson v. Priest,* 193 Colo. 222, 564 P.2d 122, 123 (1977) (granting of *ex parte* motion temporarily changing custody of child from mother to father violated mother's due process rights).

clearly established at the times of the alleged violations. A third case, *Robison,* explicitly stated that the right to due process in such situations had been clearly established as of 1981. *See Robison,* 821 F.2d at 921. Two of the cases, *Hooks* and *Weller,* noted that the immediate removal of the children to another jurisdiction had effectively eliminated the possibility of a postdeprivation hearing.

The only distinguishing point is that these precedents arose out of the conduct of state actors acting pursuant to state law, while this case arises out of the conduct of federal agents acting pursuant to an international treaty and the federal law that implements it. Extending these precedents to this situation, however, is not a "fluctuation in legal debate" that the federal defendants could be forgiven for failing to predict. *See Doe,* 257 F.3d at 331. Rather, applying the Due Process Clause to the actions of State Department employees is an "obvious inference from a generally established right." *Id.*

b. Violations of ICARA, State Law, and Federal Regulations

The preceding analysis is a sufficient and independent rationale for finding that the federal defendants are alleged to have violated a clearly established right. There are, however, additional reasons that may support this finding; namely, the federal defendants' alleged conduct also likely violated ICARA, state law, and federal regulations. Before I discuss these violations, however, I will explain why they may be relevant to the qualified immunity analysis.

*Doe v. Delie* is the Court of Appeals' most recent decision addressing the qualified immunity defense. In *Doe,* a former inmate of the Pennsylvania Department of Corrections claimed that prison officials had violated his constitutional right to medical privacy by allowing others to learn

that he was HIV-positive. *See Doe,* 257 F.3d at 311. The panel ultimately affirmed the dismissal of the claim, but it was divided. Judge Garth was unwilling to declare that there is a constitutional right to medical privacy in prison. *Id.* at 323. Judge Nygaard believed that there is right to medical privacy in prison and that the right was clearly established at the time of the alleged violation. *Id.* at 330. Judge Roth was of the view that there is a right to medical privacy in prison but the right was not clearly established at the time of the alleged violation. *Id.* at 311.

There was also a difference of opinion as to whether a concurrent violation of state law is relevant to the qualified immunity inquiry. Judge Roth found that such evidence is not relevant because "[t]he Supreme Court has held that officials do not forfeit qualified immunity from suit for violation of a federal constitutional right because they failed to comply with a clear state statute." *Id.* at 318. Judge Nygaard disagreed. He argued that an overlapping state law should "raise [an] official's awareness that a parallel federal right may exist" and therefore is relevant to the qualified immunity inquiry. *Id.* at 334. Judge Garth did not reach the issue.

It is not my function to determine whether Judge Roth's or Judge Nygaard's view is correct. Cognizant of the disagreement, however, I feel obliged to discuss plaintiff's contention that the federal defendants also violated ICARA, state law, and federal regulations because the Court of Appeals may ultimately find this contention relevant to the qualified immunity analysis.

First, ICARA provides that notice "be given in accordance with the applicable law governing notice in interstate child custody proceedings." *See* 42 U.S.C. § 11603(c). Courts interpreting this provi-

sion have found the "applicable law" to be the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A ("PKPA"), and the Uniform Child Custody Jurisdiction Act, 23 Pa.C.S.A. § 5341, et seq. ("UCCJA"). *See Brooke v. Willis,* 907 F.Supp. 57, 60 (S.D.N.Y.1995); *Klam v. Klam,* 797 F.Supp. 202, 205 (E.D.N.Y.1992). Both PKPA and UCCJA provide for "reasonable notice and opportunity to be heard." *See* 28 U.S.C. § 1738A(e); 23 Pa.C.S.A. § 5345. This generally means "a plenary hearing at which both sides are heard." *Klam,* 797 F.Supp. at 205.

*Klam* is instructive. In *Klam,* a German father alleged that his ex-wife was unlawfully retaining their children in New York and that the children should be returned to Germany pursuant to the Hague Convention and ICARA. To that end, he filed an ICARA petition asking that his children be taken into protective custody before the mother was notified of the ICARA proceedings. *Id.* at 203. In support of this request, the petition made a series of conclusory assertions, including the claim that the children were being "wrongfully detained" from the nation of their "habitual residence" and that the children would be "carried out of the jurisdiction" and "suffer irreparable injury" unless the petition was granted. *Id.* at 204. The court was confronted with the issue of whether the petition could be granted *ex parte* based only on those assertions. *Id.* at 206.

The court concluded that *ex parte* relief would violate the procedural protections of ICARA and gave two rationales for this conclusion. First, the court looked to a series of cases holding that *ex parte* relief is inappropriate under PKPA and UCCJA absent "a showing of extraordinary circumstances." *Id.* Second, the court was hesitant to rely on the unsubstantiated allegations contained in the petition. *Id.*

It therefore denied the *ex parte* request for interim relief, but stated that it would allow the father to proceed after the mother had been served. *Id.* at 207 n. 5.

The petition submitted to Judge Nealon was remarkably similar to the petition rejected by the court in *Klam.* For example, it alleged that plaintiff's removal of his son from Hungary in December 1993 was a "wrongful removal" from the child's "habitual residence" within the meaning of the Hague Convention and ICARA. *See* ICARA Petition of Aniko Kovacs (May 13, 1994) ¶¶ 2, 5 and 6. The petition also alleged that Egervary would "upon being informed of these proceedings ... further abduct and secrete the child." *Id.* ¶ 12. However, Kovacs' petition also went a significant step further than the *Klam* petition. The petition asked that Oscar be turned over to Rooney immediately and returned to Kovacs, rather than being held pending final resolution of the ICARA petition. *Id.* ¶ 13. The petition at issue in this case was, therefore, a more egregious violation of plaintiff's rights than the petition involved in *Klam.* I therefore conclude that the federal defendants' alleged conduct violated the ICARA notice provision.

■ Second, ICARA provides that a child cannot be "removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." *See* 42 U.S.C. § 11604(b). The notice provision of the Pennsylvania version of the UCCJA, 23 Pa.C.S.A. § 5345, states that: "Before making a decree under this subchapter, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of the child." The *Klam* analysis above is sufficient to show that the federal defendants' alleged conduct also violated this state law.

Finally, there also is evidence from which it could be concluded that the federal defendants violated the State Department's regulations governing the Hague Convention. Those regulations provide that: "The U.S. Central Authority [i.e., the Bureau of Consular Affairs where the federal defendants worked] is prohibited from acting as an agent or attorney or in any fiduciary capacity in legal proceedings arising under the Convention." *See* 22 C.F.R. § 94.4(a). However, the U.S. Central authority "shall . . . [a]ssist applicants in securing information useful for choosing or obtaining legal representation, for example, by providing a directory of lawyer referral services, or pro bono listing published by legal professional organizations, or the name and address of the state attorney general or prosecuting attorney who has expressed a willingness to represent parents in this type of case and who is employed under state law to intervene on the applicant's behalf." *See* 22 C.F.R. § 94.6(d).

The federal defendants have repeatedly cited these regulations as evidence that they could not have engaged in any conduct that violated plaintiff's due process rights. *See, e.g.,* Federal Defendants' Br. (August 7, 1996) at 11; Federal Defendants' Br. (May 11, 2001) at 26–27; Federal Defendants' Reply Br. (July 9, 2001) at 25.[29] It is clear, however, that the federal defendants' conduct—even the limited account of their conduct that has been set forth in their briefs—exceeded what they were authorized to do under the regulations. In their briefs, the federal defendants acknowledge that they: 1) contacted Rooney to ask him to represent Kovacs; and 2) sent Rooney written materials that would assist him in drafting the ICARA

petition. *See* Federal Defendants' Br. (July 9, 2001) at 2–7 ("Statement of Undisputed Facts"). Section 94.6(d) does not authorize the State Department to retain an attorney on behalf of a petitioner or to give substantive assistance to an attorney. Rather, it permits assistance in "securing information useful for choosing or obtaining legal representation." When the federal defendants—by their own admission—helped Kovacs to find an attorney and then provided that attorney with written information to assist him in drafting the petition the federal defendants exceeded their authority under § 94.6(d) and became an "agent" of Kovacs, which is prohibited under § 94.4(a).

To reiterate, the federal case law previously discussed is, in my view, more than sufficient to establish that the federal defendants violated plaintiff's clearly established right to notice and opportunity to be heard. However, if the Court of Appeals should adopt Judge Nygaard's *Doe* opinion, there also is ample evidence that federal defendants violated ICARA, state law, and State Department regulations.

### 3. The Federal Defendants' Reply Arguments

All of the federal appellate decisions discussed in my analysis of the qualified immunity issue were also discussed at length in *Egervary II. See Egervary II,* 80 F.Supp.2d at 497–504. When I denied the federal defendants' motion for reconsideration of my order allowing plaintiff to file an amended complaint, I specifically called that discussion to their attention and stated my belief that the "wealth of authorities" cited therein would be probative of

---

**29.** I note that each time the federal defendants have quoted § 94.6(d) they omitted the phrase "and who is employed under state law to intervene on the applicant's behalf," a phrase that is difficult to reconcile with the fact that Rooney, Burke, and Nallin were private attorneys who were not "employed under state law."

the qualified immunity decision. *See* Order (March 23, 2001) at 3. Since that time, the federal defendants have filed 105 pages of briefs on the motion to dismiss and motion for summary judgment, yet they have never cited, discussed, or attempted to distinguish any of those cases.

Instead, they have argued for qualified immunity by mischaracterizing the conduct they are alleged to have engaged in and the right they are alleged to have violated. For example, they argue that:

- "Plaintiff's claim against the Federal Defendants boils down to the contention that they offered legal advice that prompted the plaintiff's former wife, a litigant in court proceedings, to seek and obtain relief from Judge Nealon that violated plaintiff's due process rights under the Fifth Amendment." *See* Federal Defendants' Br. (May 11, 2001) at 25.

- "Plaintiff's claim is limited to the allegation that the Federal Defendants offered inaccurate legal advice to counsel for the plaintiff's former wife concerning the type of relief she, as a litigant, could request from the court." *Id.* at 26.

- "[T]he Federal Defendants, neither of whom was a lawyer, allegedly gave this legal advice to defendant Rooney, who was a lawyer and who represented the plaintiff's wife in all court proceedings ... it is inherently illogical to suggest that lay persons should be held responsible for providing allegedly inaccurate legal advice to a lawyer ..." *Id.* at 27–28.

- "[T]here plainly was no 'clearly established' law that defendants Young and Schuler, neither of whom are lawyers, could be held responsible for violating plaintiff Egervary's constitutional rights for supposedly advising defendant Rooney ..." *Id.* at 30.

- "In this case, defendants Young and Schuler may not be held responsible for any of the actions by defendant Rooney in seeking an order from Judge Nealon for the seizure of the plaintiff's son and then executing the Court's order, merely because the Federal Defendants supposedly advised him that he might be able to seek such an order." *Id.* at 31.

- "[P]laintiff completely fails to address the Federal Defendants' argument that in May, 1994 there was no 'clearly established' law that they could be liable to the plaintiff for a violation of his due process rights under the circumstances of this case, where they allegedly offered advice to the attorney for plaintiff's former wife concerning the type of relief which she could seek in court." *See* Federal Defendants' Reply Br. (July 9, 2001) at 22.

- "Plaintiff ... does not offer a single case or any other legal authority to support his claim that the Federal Defendants, neither of whom is a lawyer, may be held liable for allegedly offering inaccurate legal advice to the attorney for a third party ..." *Id.* at 24.

Assuming *arguendo* that plaintiff's claim were "limited to the allegation that the Federal Defendants offered inaccurate legal advice," it is unclear whether the federal defendants could be held liable. It is clear that the qualified immunity defense does not absolve the federal defendants of liability simply because they are not lawyers (as they seem to imply in the passages quoted above). Rather, the qualified immunity defense is predicated on the concept that competent government officials will have a reasonable working knowledge of federal constitutional law. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

It is clear, however, that this case is about more than just offering inaccurate legal advice. Plaintiff alleges, and based on the current record a reasonable jury could conclude, that the federal defendants did the following:

- In violation of State Department regulations, the federal defendants retained a private attorney on behalf Aniko Kovacs. *See supra* Part III–D–2–b;

- The federal defendants conspired with, gave substantial assistance or encouragement to, and/or ordered or induced Rooney to present a petition to Judge Nealon that made false representations of fact and requested removal of the plaintiff's child from his custody without notice or opportunity to be heard. *See infra* Part III–E;

- The federal defendants contacted Judge Nealon's chambers on the morning that the ICARA petition was filed to alert the Court that Rooney would be presenting the petition that day. *See* Rooney Dep. at 120–21. *See also infra* Part III–E–3–b;

- In response to an inquiry from Judge Nealon, the federal defendants communicated through Rooney that the "official State Department position" was that the child could be lawfully removed from his father's custody and returned to Hungary without a hearing. *See* Rooney Dep. at 115–16, 131–32. *See also* Nealon Dep. at 16–20, 22–24, 26–28, 139–40;

- The federal defendants arranged for a passport waiver so that the child could immediately be returned to Hungary, effectively eliminating the possibility of a postdeprivation hearing. *See* Rooney Dep. at 165–66; Mannicci Dep. at 19, 22–23. *See also infra* Part III–E–3–f.

Plaintiff's claim, therefore, is not "limited to the allegation that the Federal Defendants offered inaccurate legal advice."

### E. Personal Involvement

Finally, the federal defendants move for summary judgment on the grounds that there is insufficient evidence of their personal involvement in the alleged deprivation of plaintiff's due process rights. I disagree.

#### 1. The Summary Judgment Standard

Rule 56 empowers a court to grant summary judgment if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party must state the basis for its motion and identify those portions of the record which it believes indicate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the burden of persuasion at trial, it may properly support its motion merely by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548.

In response to a properly supported motion for summary judgment, the non-moving party must point to specific facts demonstrating that a genuine issue exists for trial. *See* Fed.R.Civ.P. 56(e). It may not rest upon unsupported allegations or denials. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "mere scintilla of evidence" supporting the non-moving party's position is insufficient to create a genuine issue of material fact; there must be sufficient evidence from which a jury could reasonably find for the non-moving party. *Id.* at 252, 106 S.Ct. 2505. "Credibility

determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" should be left to the jury. *Id.* at 255, 106 S.Ct. 2505. All evidence must be viewed in the light most favorable to the non-moving party. *Id.*

I note that the federal defendants' arguments in support of their motion misapply the summary judgment standard in a number of ways. First, although this is their motion for summary judgment Young and Schuler have not submitted affidavits giving their account of the events in this case.[30] In their briefs, however, they make factual claims about their conduct. For example, they claim that the passport waiver was granted by the duty officer in the State Department's Passport Services office and that they had no involvement in issuing the waiver. *See* Federal Defendants' Br. (August 17, 2001) at 16–17. There is no evidence in the record to establish those facts, and, as I will explain in greater detail below, the record supports the inference that Young had some involvement in obtaining the waiver. The federal defendants' unsworn denial of that fact cannot affect my analysis.

Second, the federal defendants have at times attempted to rebut damaging testimony by citing other testimony that, in their view, explains away the damaging testimony. For the purposes of a summary judgment motion, however, I must assume that a jury might give no weight to the explanatory testimony. Therefore, even if I find the explanatory testimony to be reasonable I must find that an issue of fact exists on that point.

2. The Legal Standard for Personal Involvement in a Constitutional Tort

The federal defendants begin their summary judgment argument by claiming that

plaintiff "has never coherently articulated his theory of liability." *See* Federal Defendants' Br. (August 17, 2001). I disagree.

Plaintiff has discussed the legal standard for personal involvement in a constitutional tort. *See* Plaintiff's Br. (August 3, 2001) at 4–5. Specifically, he relies upon *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir.1988), and *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir.1997). In *Rode*, the Court of Appeals held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode*, 845 F.2d at 1207. The *Robinson* Court later discussed the *Rode* requirement in situations where a government employee has supervisory authority over the person who commits the constitutional tort. *See Robinson*, 120 F.3d at 1294. The *Robinson* Court also stated in a footnote that when the issue arises in other situations, courts should be guided by the Restatement (Second) of Torts §§ 876 and 877(a). *Id.* at 1294 n. 6.

Section 876 states:

PERSONS ACTING IN CONCERT

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Section 877(a) states:

---

**30.** Their depositions have yet to be taken.

DIRECTING OR PERMITTING CONDUCT OF ANOTHER

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own . . .

On this basis, plaintiff has argued that the federal defendants potentially could be held liable under any of these standards (conspiring with, giving substantial assistance or encouragement to, and/or ordering or inducing the conduct). In my view, plaintiff's discussion is coherent and supported by *Rode* and *Robinson*. The federal defendants, however, have not cited any authority to guide my consideration of their alleged personal involvement and have argued for at least three different standards in their briefs.[31]

■■■ For the purposes of this motion, I need not decide which provision of the Restatement applies to plaintiff's claim. The federal defendants' analysis of the record consistently argues that there is no evidence that they knew what Rooney was doing, and knowledge of the other party's action is arguably a prerequisite to liability under any of the provisions of Restatement §§ 876 and 877(a).[32] I find, however, that there is ample evidence that the federal defendants' knew of Rooney's actions. Moreover, viewing the record in the light most favorable to plaintiff a jury could reasonably conclude that the federal defendants conspired with, gave substantial assistance or encouragement to, and/or ordered or induced Rooney's actions.

3. Evidence of Personal Involvement

a. The Retention of and Assistance to Rooney and the Model Pleadings

The starting point for the federal defendants' analysis of the record is the model pleadings that Young sent Rooney. In numerous instances, each of which will be discussed in greater detail below, the federal defendants argue that they could not have known that Rooney was seeking an *ex parte* order because the model pleadings did not provide for *ex parte* proceedings. *See, e.g.,* Federal Defendants' Br. (July 9, 2001) at 13 ("Rooney's purported assumption that defendant Schuler thought that defendant Rooney was seeking an *ex parte* order is not worthy of any consideration because it was inconsistent with the model pleadings pointed out to defendant Rooney by the State Department."). There are two problems with this argument.

First, this argument ignores the extensive contacts that Rooney had with Young and Schuler after he received the model pleadings. Rooney testified that he "had to rely on them [i.e., Young and Schuler] to help [him]" because he "was not extremely well-versed on The Hague." *See* Rooney Dep. at 62. He therefore spoke to

---

31. In their initial summary judgment brief, they argue, in effect, that the proper standard is whether they knew what Rooney was doing. *See, e.g.,* Federal Defendants' Br. (July 9, 2001) at 2 (arguing that Young and Schuler were never "informed" by Rooney that he intended to seek an *ex parte* order). In their summary judgment reply brief, the federal defendants first argue that the proper standard is whether they "authorized or encouraged" Rooney. *See* Federal Defendants' Br. (August 17, 2001) at 25 n. 6. Later in that brief, however, they argue that the proper standard is whether they exercised "control" over Rooney. *Id.* at 27, 564 P.2d 122.

32. I note, however, that comment a to Restatement § 877 states: "If he intends the result, it is immaterial that the tortious means used are not those originally contemplated, provided the defendant's order or inducement is one of the contributing factors."

them "a bunch of times." *Id.* Burke confirmed that during the days when Rooney was receiving that help "they [i.e., Young and Schuler] seemed to be calling constantly ... I remember the phone calls was [sic] constantly coming in and it was the State Department ... they were calling all the time it seemed like." *See* Burke Dep. at 26–27. Similarly, on the day of the *ex parte* meeting, Rooney was "continuously in conversation" with the State Department. *Id.* at 71. Given this volume of phone calls after Rooney received the model pleadings, a reasonable jury could infer that the model pleadings were merely the starting point for the help Rooney received from the federal defendants.

Second, the federal defendants mischaracterize the contents of the model pleadings. They argue that the model pleadings "provided for full notice of all proceedings." *See* Federal Defendants' Br. (August 17, 2001) at 10. This is incorrect. The model pleadings in fact suggest an initial *ex parte* proceeding without notice to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hearing with notice.

The model pleadings Young sent Rooney consisted of two parts. The first was a model ICARA petition. *See* Federal Defendants' Br. (July 9, 2001) at Exhibit G. The model petition contains two provisions that are relevant to the present discussion. The first is labeled "Notice of Hearing." It provides: "Pursuant to 42 U.S.C. § 11603(c), Respondent shall be given notice pursuant to [state law]." The federal defendants' contention that the model pleadings provided for "full notice of all proceedings" apparently rests on this provision. However, as my previous discussion of 42 U.S.C. § 11603(c) showed, this statute merely provides for "reasonable

notice and opportunity to be heard" and allows for the seizure of a child without prior notice in "extraordinary circumstances." *See supra* Part III–D–2–b, *discussing* § 11603(c) and *Klam.* Therefore, read in isolation the "Notice of Hearing" provision of the model petition does not stand for the proposition that the alleged parent-kidnapper will be given "full notice of all proceedings."

The other relevant provision of the model petition also does not support the federal defendants' claim. The model petition also contains an optional provision labeled "Provisional Remedies." This provision states that the petitioner "believes that Respondent, upon being informed of these proceedings, will further abduct and secrete the child." *See* Federal Defendants' Br. (July 9, 2001) at Exhibit G. It goes on to state that because of this threat of further flight the petitioner is simultaneously presenting a "petition for warrant in lieu of habeas corpus" that provides for the immediate seizure of the child without prior notice to the alleged parent-kidnapper and placement of the child in protective custody "until a determination is made under this petition." *Id.* This provision reinforces the conclusion that the model petition does not provide for "full notice of all proceedings."

The second part of the model pleadings Young sent Rooney was a sample of the warrant referred to in the "Provisional Remedies" provision of the model petition. *See* Federal Defendants' Br. (July 9, 2001) at Exhibit H. The model warrant is essentially an order with three different options from which the judge can choose. It is directed to "any peace officer" within the state and begins by stating that the court believes the child in question is being illegally held and that there is reason to believe that the parent-kidnapper will carry the child out of the jurisdiction. *Id.* It

then lists the options for seizing the child. The first option orders the child to be seized and brought before the court for an immediate hearing. *Id.* The second option orders the child to be seized and placed in a juvenile shelter until a hearing is "promptly" conducted. *Id.* The third option orders the child to be seized and turned over to the Petitioner, who is ordered to "immediately" calendar a hearing and is prohibited from removing the child from the county. *Id.* The model warrant also provides the judge with the option of ordering the same officer who seizes the child to serve the alleged parent-kidnapper with a copy of the petition, implicitly for the first time. *Id.*

As was discussed above, the model petition provides for the possibility that some proceeding will occur before the alleged parent-kidnapper is given notice. The model warrant goes a step further. It provides three specific options for seizing the child before the alleged parent-kidnapper has been given notice. Read together, these model pleadings do not provide for "full notice of all proceedings." Rather, they suggest an initial *ex parte* proceeding without notice to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hearing with notice.

### b. The Phone Call to Judge Nealon's Chambers

On two different occasions, Rooney testified that someone from the State Department called Judge Nealon's chambers on May 13, 1994 to inform the Court that a Hague Convention petition was going to be presented that day.

In his interrogatories, Rooney was asked to "set forth the date, time and manner in which [the meeting with Judge Nealon on May 13, 1994] was arranged and the persons involved in making such arrangements." *See* Rooney Interrogatories (July 17, 1998) at 7(c). Rooney answered: "I believe the State Department advised Judge Nealon's chambers of the pending action. I do not recall any other specific details." *See* Rooney Amended Answers (undated) at 7(c).

Similarly, in his deposition the following exchange occurred:

Q: In your Answers to Interrogatories I believe you said, and I don't have them in front of me but I will get them if there's a question about this, I believe that you said that the State Department had contacted the court to arrange for you to appear before Judge Nealon.

A: I don't know if they called to arrange. They called to inform the court that a petition would be presented involving a Hague matter. I don't know who called, I don't know with whom they spoke; I just knew that by the time we got there the judge was aware or the judge's chambers was aware of someone coming in with a petition. I also think that we may have called, someone from my office may have called, to advise the judge that we were on our way to Scranton.

Q: What made you think that someone from the State Department had contacted chambers?

A: I may have recalled the secretary saying, Oh, yes, we got a call from the State Department saying that a petition was going to be brought in.

*See* Rooney Dep. at 120–21.

This evidence is potentially harmful to the federal defendants' claim that they had no personal involvement in the ICARA proceedings. It is difficult for them to argue that they did not know what Rooney was doing if they called Judge Nealon's

chambers that day to inform the Court that Rooney was on his way with an ICARA petition. They therefore attempt to rebut Rooney's testimony with testimony from Judge Nealon and Burke.

The federal defendants argue that "Judge Nealon's testimony conclusively rebuts plaintiff's argument that there is a fact issue in this case as to whether the Federal Defendants somehow influenced Judge Nealon's decision by contacting the judge's chambers to schedule the *ex parte* hearing." *See* Federal Defendants' Br. (August 17, 2001) at 2. In support of that argument, they quote the following questions and answers from Judge Nealon's deposition:

Q: Now, do you have any information that anyone from the State Department contacted anyone in your chambers about the possible filing of this petition by Mr. Rooney before it was actually filed?

A: I have no information like that. See the procedure is when an emergency matter is filed with the clerk's office they—someone in the clerk's office may and usually does seek some information as to what it's about, and the reason for that is there may be a matter that a particular judge doesn't want to handle or that he may have a conflict.

Q: Do you have any information that anyone from the State Department

contacted the clerk's office about this matter prior to its being filed?

A: No, I have not.

*See* Nealon Dep. at 86–87. Judge Nealon's testimony on this point does not "conclusively rebut" Rooney's testimony. Judge Nealon merely stated that he had no information regarding a call from the State Department prior to his meeting. That does not necessarily mean that his secretary did not receive such a call.[33]

The federal defendants also argue that Burke's testimony on this point "eliminated any confusion." *See* Federal Defendants' Br. (July 9, 2001) at 8 n. 6. Burke testified as follows:

Q: Did you, at any point before going to court, telephone the court to arrange for the matter to be presented to a judge?

A: I think I talked to—I think I personally got the name of the law clerk from Attorney Nallin and then I don't know if I called him or if Fred called him as to scheduling of this or at least of an understanding of when we could go in to see Judge Nealon.

*See* Burke Dep. at 41.

There are two problems with the federal defendants' reliance on this testimony. First, there is not necessarily a conflict between Burke's and Rooney's testimony. Burke testified that he got the number from Nallin and gave it to Rooney but does not remember who actually called. Roo-

---

**33.** The federal defendants go on to argue that they never had any direct contact with Judge Nealon "that could conceivably have influenced him." *See* Federal Defendants' Br. (August 17, 2001) at 4. That statement appears to be true but is not relevant to plaintiff's claim. Plaintiff does not contend that there was any direct contact. He does contend, however, that there was indirect contact sufficient to establish that the federal defendants conspired with, gave substantial assis-

tance and encouragement to, and/or ordered or induced Rooney. Moreover, Judge Nealon unequivocally stated: "If it weren't for the involvement of the State Department I would not have taken the action I did take." *See* Nealon Dep. at 140. Therefore, unless Rooney misrepresented the nature and extent of the federal defendants' involvement, their alleged indirect contact clearly did influence Judge Nealon.

ney testified that when they arrived for the hearing, the Judge's staff was expecting them. He possibly remembers the Judge's secretary saying that the State Department had called, but he admits that his office may have "also" called. *See* Rooney Dep. at 120–21. Notably, neither Rooney nor Burke remember placing the call themselves. A jury could reasonably conclude that there is no actual conflict in this testimony and that someone from the State Department placed the call.

Second, if there is an actual conflict between Rooney's and Burke's testimony, a reasonable jury could credit the former and ignore the latter (or vice-versa). For the purposes of a summary judgment motion, I must read the evidence in the light most favorable to plaintiff and assume that a jury would credit Rooney's testimony. The federal defendants' real objection to this testimony seems to be that Rooney does not have a vivid memory of what happened and equivocates in his testimony; however, any uncertainty in his testimony is a matter for impeachment before the jury.

I therefore conclude that there is a material issue of fact as to whether the federal defendants contacted Judge Nealon's chambers.[34]

### c. The Federal Defendants' Ignorance of the "Fourth Option"

The parties agree that the petition and warrant Rooney presented to Judge Neal-

on differed from the model pleadings Young had sent him in one crucial respect. The model pleadings provide three options for an initial *ex parte* proceeding without notice to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hearing with notice. *See supra* Part III–E–3–a. The fourth option added by Rooney eliminated the postdeprivation hearing. Specifically, it provided that Oscar would be "take[n] into protective custody ... and deliver[ed] to Petitioner's agent for immediate return to the physical custody of Petitioner."[35] *See* Federal Defendants' Br. (July 9, 2001) at Exhibit F.

The federal defendants initially claimed that Rooney "stated at his deposition that he did not recall even mentioning the fourth option to anyone at the State Department when he decided to add it to the proposed order." *See* Federal Defendants' Br. (July 9, 2001) at 8. In support of this assertion, they cited, but did not quote, the following testimony:

Q: Before that conversation with Mr. Schuler do you know whether Mr. Schuler was aware that you had added that paragraph to the standard form for a Warrant in Lieu of Writ of Habeas Corpus?

A: I don't recall. I don't recall if I spoke to Ginny Young about it or if I spoke to Schuler about it.

---

**34.** In addition, I note that Rooney's testimony is arguably helpful to plaintiff's case even if he was wrong about who actually made the phone call. This testimony arguably shows Rooney's state of mind regarding the extent of the federal defendants' knowledge of his actions. He thought it was at least possible that the federal defendants called Judge Nealon's chambers the day of the meeting. Such a call would not have been possible if their personal involvement ended with the transmission of the model pleadings a few days before.

**35.** The fourth option was similar to the third option, in that both provided for Oscar to be taken from his father's custody and placed in his mother's custody. The third option, however, provided that Oscar could not be removed from Monroe County pending a hearing, while the fourth option eliminated the need for (or possibility of) a postdeprivation hearing by ordering the child's immediate return to Hungary.

*See* Rooney Dep. at 116. Even read on its own, without the benefit of the additional testimony I will quote below, this passage does not support the federal defendants' assertion that Rooney did not mention the immediate return option to "anyone" at the State Department. The common sense reading of Rooney's answer is that he spoke to either Young or Schuler about it but could not remember which it was.

In addition, the federal defendants did not refer to the following testimony, which appears the page before the passage the quoted above:

Q: Did you discuss with Ms. Young or anyone else at the State Department the paragraph of the warrant in lieu of Writ of Habeas Corpus that you added to the form that you referred to earlier?

A: I did the day the order was presented. I spoke to James Schuler about it.

*Id.* at 114–15.

These two passages rebut the federal defendants' assertion that Rooney never mentioned the fourth option to Young and Schuler: Rooney testified that he was unsure which of them he had spoken to about the fourth option in the days before the *ex parte* hearing, but he was certain that he had spoken to Schuler about it on the day of the hearing.

In their reply brief, the federal defendants admit, at least in part, that they misread Rooney's testimony. *See* Federal Defendants' Br. (August 17, 2001) at 10 n. 2. They now admit that Rooney told Schuler about the fourth option on the day of the meeting with Judge Nealon but do not acknowledge that Rooney may have informed Young or Schuler about it in the preceding days. *Id.*

They now argue that Schuler's knowledge of the fourth option was "clearly irrelevant under the circumstances" because Schuler did not know that Rooney's meeting with Judge Nealon was *ex parte. Id.* As was previously discussed, however, the model warrant that Young sent Rooney was designed for the express purpose of seizing the child before the alleged parent-kidnapper had notice. *See supra* Part III–E–3–a. The federal defendants concede that it is "reasonable" to assume that "Schuler would have been familiar with the model pleadings." *See* Federal Defendants' Br. (July 9, 2001) at 14. Therefore, the fact that Rooney was preceding *ex parte* was implicit when he told Schuler that he had added a fourth option to the model warrant.

d. The Federal Defendants' Ignorance of the *Ex Parte* Nature of the Meeting with Judge Nealon

The federal defendants next argue that the record "conclusively demonstrates" that they did not know that the proceedings before Judge Nealon were *ex parte. See* Federal Defendants' Br. (July 9, 2001) at 11. I disagree.

As I have previously noted, the federal defendants have not filed affidavits stating that they did not know that the proceedings were *ex parte.* Instead, they argue that that conclusion can be inferred from three facts: 1) during his phone call from Judge Nealon's chambers, Rooney did not specifically tell Schuler that the proceedings were *ex parte;* 2) the model pleadings that Young sent Rooney provided for "full notice of all proceedings"; and 3) *ex parte* proceedings are rare in ICARA cases.

The federal defendants rely on the following passage from Rooney's deposition:

Q: Did you, during that conversation [from Judge Nealon's chambers], advise Mr. Schuler that no notice of this, the filing of this petition, had been given to Mr. Egervary?

A: No, but I think that we would have assumed that that was the case simply because in most Hague matters notice is not given to someone who has been determined to be an abducting parent for fear that upon notice of something pending that there would be a flight with a child. It would have been highly irregular to give notice to a parent in this situation for fear that the child would then be taken someplace else.

*See* Rooney Dep. at 131–32.

This passage says what the federal defendants claim it says; namely, during the phone call from Judge Nealon's chambers Rooney did not specifically tell Schuler that the proceedings were *ex parte*. This fact, however, does not establish that Schuler did not know that the proceedings were *ex parte*. In fact, Rooney states that he assumes Schuler knew they were. The federal defendants therefore argue that "Rooney's purported assumption that defendant Schuler thought that defendant Rooney was seeking an *ex parte* order is not worthy of consideration because it was inconsistent with the model pleadings pointed out to defendant Rooney by the State Department ... there was no logical reason for defendant Schuler to have merely assumed that defendant Rooney was proceeding without notice to Mr. Egervary." *See* Federal Defendants' Br. (July 9, 2001) at 13.

As I have previously discussed, however, those model pleadings did not provide for "full notice of all proceedings." *Cf.* Federal Defendants' Br. (August 17, 2001) at 10. They provided for an initial *ex parte* proceeding without notice to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hear-

ing with notice. *See supra* Part III–E–3–a. Therefore, there was a logical reason for Schuler to have assumed that Rooney was proceeding *ex parte;* namely, the model pleading suggested that an in initial *ex parte* proceeding was appropriate.

The federal defendants also argue that Rooney was wrong to assume that Schuler knew the proceedings were *ex parte* because *ex parte* proceedings are rare in ICARA cases:

The *ex parte* process utilized by defendant Rooney was not normal or routine, as he apparently believed. This Court has already determined that the *ex parte* process violated the Due Process Clause of the Fifth Amendment, and the Court has even gone so far as to suggest that the process was so obviously flawed as to likely violate plaintiff's clearly established constitutional rights. *See* Order of March 23, 2001 at p. 3. It can hardly be argued that defendant Schuler should have merely assumed under the circumstances that defendant Rooney was engaged in a clearly unlawful process because defendant Rooney failed to specify otherwise.

*Id.* at 13.

This argument is flawed for two reasons. First, the federal defendants misstate my earlier findings of why the proceedings were constitutionally deficient. I did not say that a defendant in an ICARA proceeding must invariably receive prior notice of the proceedings. To the contrary, I stated that such defendants are entitled to either prior process or a prompt, state-initiated postdeprivation hearing. Therefore, Rooney's statement that it is highly unusual to give prior notice to such defendants does not necessarily conflict with my earlier findings.[36]

**36.** In addition, I note that the model pleadings do not necessarily conflict with my earlier findings. The model pleadings suggested an initial *ex parte* proceeding without notice

Second, and more importantly, what I have written about the nature of the due process rights that were at stake is irrelevant to what Rooney and Schuler communicated to one another that day. Whether Rooney and Schuler thought that prior notice is highly irregular in such situations is a factual question that must be answered with reference to the record, not with reference to my earlier legal determinations.

What is relevant, therefore, is: 1) what the State Department's actual practice in such situations was prior to May 1994; and 2) the course of conduct between Rooney and Schuler that preceded that conversation.[37] Because Young and Schuler have not been deposed and I do not have their affidavits, the record is silent as to the State Department's prior practices in these situations. The record is replete, however, with evidence of the course of conduct between Rooney and the federal defendants. That course of conduct included numerous phone conversations and the transmission to Rooney of model pleadings that suggested an initial *ex parte* proceeding without notice to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hearing with notice. On this basis, a reasonable jury could conclude that Schuler knew the proceedings were *ex parte*.

Finally, Rooney is not the only person to have testified on this point. In Judge Nealon's deposition, counsel for the federal defendants read the portion of Rooney's

to the alleged parent-kidnapper followed by seizure of the child and a prompt postdeprivation hearing with notice. This procedure is consistent with due process if there is an emergency situation sufficient to justify the initial removal of the child without notice, a condition that is probably satisfied in the case of a parental kidnapping if there is a bona fide threat of further flight.

**37.** The federal defendants attempt to rebut this conclusion by arguing that: "The immunity test under the doctrine never involves delving into the subjective thought processes or beliefs of the [government official] at the time of the alleged unconstitutional action." *See* Federal Defendants' Br. (July 9, 2001) at 15. This conclusion follows, they argue, from the fact that qualified immunity depends upon the "objective legal reasonableness" of the government official's actions. *Id.* Therefore, they conclude, "Young and Schuler's subjective thoughts at the time of their alleged conduct are irrelevant" and qualified immunity must be judged solely based upon what Rooney "actually communicated" to Schuler in the conversation from Judge Nealon's chambers. *Id.* at 16. This argument is flawed for two reasons. First, assuming *arguendo* that Young and Schuler's subjective thoughts are irrelevant, there is no reason why the inquiry into what was "actually communicated" would end with the conversation from Judge Nealon's chambers. Rooney testified that he had spoken to the State Department "a bunch of times" in the days before, and Burke testified that Rooney had spoken to the State Department at least three other times on the day of the *ex parte* hearing. *See* Rooney Dep. at 62; Burke Dep. at 70–71. Second, the two cases the federal defendants cite in support of their argument rebut the conclusion they draw. In *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court stated that "the determination whether it was objectively legally reasonable to conclude that a given search was supported by probably cause or exigent circumstances will often require examination of the information possessed by the searching officials." An examination of the "information possessed" by the officials is an examination of their subjective thoughts. Similarly, in *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), the Court stated that the reasonableness of the arrest at issue in that case should have been judged according to "the facts and circumstances within [the officers'] knowledge" at the time of the arrest. That is also an inquiry into their subjective thoughts. Similarly, the question in this case, a question ultimately for a jury, is what Young and Schuler knew based upon the facts and circumstances, not whether Rooney uttered the right words.

deposition quoted above, and the following exchange occurred:

Q: Did Mr. Rooney ever tell that he had not actually given notice to Mr. Schuler when he called him on the telephone in the break in the conference that you had that this was an *ex parte* hearing?

A: Did he ever say that to me, is that what you're saying?

Q: Yes.

A: No.

Q: And would it have been significant to you if you knew that Mr. Schuler, the representative from the State Department that Mr. Rooney had spoken to, did not know that it was an *ex parte* hearing?

A: It would have been, but I don't know how that would be consistent with what I've told you. And that is unless Mr. Rooney isn't reporting properly. The query I presented to Mr. Rooney was to determine if it was the State Department's position, those with expertise in international law, that I should act immediately without notice and without a hearing and order that the custody of the child be turned over to the petitioner.

*See* Nealon Dep. at 129–30.

Although Judge Nealon was not a firsthand witness to the conversation between Rooney and Schuler, his testimony points out that the federal defendants' theory of that conversation is implausible. Judge Nealon repeatedly testified that he sent Rooney out to call the State Department in order to find out whether it was the Department's position that the child could be immediately returned without a hearing. *See* Nealon Dep. at 16–20, 22–24, 26–28, 139–40. The federal defendants implicitly argue not only that Rooney did not report

the query properly, but also that Schuler believed that a federal judge had stopped a full-blown adversarial hearing in order to find whether, in the State Department's view, the judge could take any action at that hearing. In other words, as Judge Nealon hinted, the phone call only makes sense if Schuler understood that Egervary was not present. Perhaps Schuler will provide some other plausible account of that phone call when he is deposed, and perhaps a jury will ultimately accept that account. On this record, however, some other explanation cannot be assumed.

e. The Phone Calls after the Meeting with Judge Nealon

Burke testified that Rooney was "continuously in conversation" with the State Department on the day of the meeting with Judge Nealon:

Q: So, is it correct that on your way to the Newark Airport you stopped at the state police barracks?

A: Some barracks or some kind of—yes, to get directions, that's what is my recollection.

Q: Do you know whether Mr. Rooney spoke with anyone at the State Department at that time?

A: You know, he did. He did also in the U.S. Marshal's Office talk to someone from the State Department. And if memory serves me, at the courthouse that day we were continuously—he was continuously in conversation with them. So, that is true, it may be three times. And then if I remember, in the courthouse, in the Marshal's Office and then at some point when we were trying to—we were driving to Newark. All that stuff occurred, we were talking to them. I don't know

what the substance of the conversations were, though.

*See* Burke Dep. at 70–71.

The federal defendants discuss these alleged phone calls for the first time in their reply brief. *See* Federal Defendants' Br. (July 17, 2001) at 15–16. They argue that: 1) Burke's testimony is inadmissible hearsay; and 2) the phone calls never happened.

Burke's testimony is not hearsay. Fed. R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Burke's testimony is not being offered to prove the truth of what Rooney asserted in those phone calls. It is being offered to prove that Rooney made the phone calls.

The claim that the phone calls never happened also fails for the purposes of this motion. As I have previously noted, the federal defendants have not submitted affidavits denying that they spoke to Rooney at the times mentioned by Burke. Instead they argue that Rooney "denied" and "specifically testified" that he did not make those phone calls. *See* Federal Defendants' Br. (August 17, 2001) at 15. In support of that claim, they quote the following testimony:

Q: What contact did you have with the State Department after you left the courthouse on May 13, 1994?

A: I contacted them to tell them that the child had been returned. I know that they appreciated the efforts that I made to get the child back to his mother. I don't know how much more contact there was between then and the time that the

motion for reconsideration was filed.

*See* Rooney Dep. at 175–76.

This is not a specific denial of Burke's testimony. Rooney seems to be referring to a phone call after he returned from Europe, not before he went, and he does not eliminate the possibility of other phone calls. He was never specifically questioned regarding Burke's claim that he was continuously in conversation with the State Department on May 13th. Moreover, if this was a specific denial of Burke's testimony, a jury could choose to accept Burke's testimony over Rooney's.

I therefore find that a jury could reasonably conclude that Rooney made phone calls to the federal defendants after the meeting with Judge Nealon and before his trip to Europe.

f. The Passport Waiver

Rooney testified that after Oscar had been turned over to him he instructed his associate, Lori Mannicci, to make arrangements for their trip to Europe. *See* Rooney Dep. at 156. Those arrangements included contacting the State Department to arrange for a passport waiver so that the child could be removed from the country immediately. *Id.* at 165–66. Mannicci testified that she could not remember anything about contacting the State Department to arrange for the waiver, including to whom she spoke. *See* Mannicci Dep. at 30–31. However, her handwritten notes from that afternoon include—on two separate pages—notations with Ginny Young's home telephone number. *Id.* at 19, 22–23 and Exhibits 9 and 10. Although there are many unanswered questions about how the passport waiver was obtained, in my view the presence of Young's home telephone number in Mannicci's notes from that day supports the inference that Young had some kind of involvement.

The federal defendants initially did not discuss the passport waiver, except to dismiss it as irrelevant to the case. *See, e.g.,* Federal Defendants' Reply Br. (July 9, 2001) at 5–6 n. 3 (arguing that the passport waiver did not have "anything of significance to do with the alleged deprivation of plaintiff's due process rights"). I disagree with this assessment. As I have stated previously, the immediate removal of the child from this country consummated the due process violation by effectively eliminating the possibility of a postdeprivation hearing. *See Egervary II,* 80 F.Supp.2d at 502 n. 7, *citing Weller,* 901 F.2d at 396, *and Hooks,* 771 F.2d at 942–43. Simply put, a jury could conclude that the passport waiver was an overt act taken in furtherance of the alleged conspiracy.

The federal defendants address the substance of the passport waiver evidence for the first time in their reply brief. *See* Federal Defendants' Br. (August 17, 2001) at 16–17. They now argue that the waiver was granted by the duty officer in the State Department's Passport Services office and that they had no involvement in issuing the waiver. *Id.* They claim, without any citation to the record or State Department regulations, that they "were not employed by Passport Services and could not themselves have granted the passport waiver." *Id.* at 17 n. 3. For the purposes of a summary judgment motion, I cannot consider these unsworn assertions.

I therefore find that a jury could reasonably conclude that Young had some involvement in seeking and/or granting the passport waiver.

g. Schuler's Follow Up Letter

The federal defendants also discuss Schuler's follow-up letter to Rooney for the first time in their reply brief. *See* Federal Defendants' Br. (August 17, 2001) at 16. They argue that the letter could not have "encouraged" Rooney's actions because it was sent a few weeks after he had returned from Europe. *Id.* That statement is literally true but does not address the real relevance of the Schuler letter to plaintiff's claim.

The federal defendants have suggested—though, again, have not provided any affidavits asserting—that Schuler's only contact with the Egervary case was the "minute or two" telephone conversation from Rooney in Judge Nealon's chambers on May 13, 1994. *See, e.g.,* Federal Defendants' Br. (July 9, 2001) at 9, 12. Schuler's follow-up letter, however, shows far more familiarity with the matter than possibly could have been gleamed from that single phone conversation, and, more importantly, shows Schuler's willingness to vouch for the facts, legal conclusions, and tactics Rooney used in the proceedings before Judge Nealon.

Schuler begins by stating that he will "briefly review the background of the case." *See* Schuler Ltr. (June 1, 1994) at 1. He then provides a six-paragraph factual narrative that is for all practical purposes identical to what Rooney had presented to Judge Nealon.[38] *Id.* at 1–2. He then opines on two of the key legal questions that were at issue in the ICARA proceedings. He asserts that Oscar was a habitual resident of Hungary and that Egervary's retrieval of the child was an "unlawful removal" under Article 3 of the Hague Convention. *Id.* at 2. He then states that: "Article 2 of the Convention asks that 'the most expeditious procedures available' be utilized in effecting implementation of Convention precepts." *Id.*

---

**38.** As I have previously explained, that factual narrative conflicts with the sworn testimony in this case in many respects. *See supra* note 8.

Though the reason for this quotation is not explicit, it can reasonably be inferred that Schuler's emphasis on the "the most expeditious procedures available" was an allusion to Rooney's immediate return of the child without a hearing.[39] Finally, Schuler concludes by thanking Rooney for his "prompt, humane and professional assistance" in handling the case. *Id.*

Rooney testified that he had sought the letter as "reassurance" because Egervary had filed a motion for reconsideration before Judge Nealon. *See* Rooney Dep. at 194. The federal defendants offer no explanation for why Schuler, who supposedly knew almost nothing about the case, was willing to vouch for Rooney on many of the points disputed in the motion for reconsideration. For the purposes of this motion, plaintiff is entitled to the inference that Schuler vouched for Rooney because they had acted in concert pursuant to a common design.

Based on the forgoing analysis of the record, I conclude that there is sufficient evidence from which a reasonable jury could conclude that the federal defendants conspired with, gave substantial assistance or encouragement to, and/or ordered or induced Rooney to take plaintiff's son from his custody in a manner that violated plaintiff's due process rights.[40]

## IV. CONCLUSION

I conclude by noting that before the motion to dismiss was filed the federal defendants stated their intention to seek an interlocutory appeal if I reject their qualified immunity defense. *See* Federal Defendants' Br. (March 20, 2001) at 8–9 ("It is well established that a federal official is entitled to an immediate interlocutory appeal if the Court denies the defense of qualified immunity ... Thus, if the Federal Defendants' motion to dismiss on the ground of qualified immunity is denied, they would expect to file an immediate, interlocutory appeal with the Third Circuit.").

Given the arguments presented to me since then, it is unclear whether the federal defendants are entitled to an interlocutory appeal. The Supreme Court has held that "a district court's denial of a claim of qualified immunity, *to the extent it turns on an issue of law,* is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis added). As I noted above, the federal defendants have not cited, discussed, or attempted to distinguish any of the cases upon which I have based the qualified immunity decision. Instead, they have argued that plaintiff's factual claim "is limited to the allegation that the

---

**39.** The federal defendants argue: "Nor does it [i.e., the letter] provide even indirect evidence that defendant Schuler had favored the *ex parte* process followed by defendant Rooney. The letter makes no reference to the *ex parte* process and there is no evidence that defendant Schuler had any knowledge of the process when he sent the letter." *See* Federal Defendants' Br. (August 17, 2001) at 16. I disagree. As I have previously discussed, the federal defendants sent Rooney model pleadings that provide for an initial *ex parte* proceeding without notice followed by a postdeprivation hearing with notice. During the phone call from Judge Nealon's chambers, if not before, Rooney says he told Schuler that he had added a fourth option that eliminated the postdeprivation hearing. Given these facts, Schuler' reference to "the most expeditious procedures available" may well be a reference to the procedures Rooney followed.

**40.** Plaintiff has argued in the alternative that he should be permitted discovery from the federal defendants pursuant to Rule 56(f) and has submitted an affidavit in support of that request. The federal defendants object to this request. I need not reach this issue because I am denying the summary judgment motion.

Federal Defendants offered inaccurate legal advice to counsel for the plaintiff's former wife concerning the type of relief she, as a litigant, could request from the court." *See* Federal Defendants' Br. (May 11, 2001) at 26. This situation is similar to *Hurlman v. Rice,* 927 F.2d 74, 81 (2d Cir.1991), wherein the court found that a district court's order denying qualified immunity was not a final judgment subject to interlocutory appeal because there were "questions of fact to be answered in order to determine whether appellants [were] entitled . . . to a defense of qualified immunity." It is not my role to determine whether the *Hurlman* analysis precludes an interlocutory appeal by the federal defendants, but I realize that it may present a problem for them.

I will proceed as follows. The accompanying Order stays discovery [41] and permits plaintiff to perfect service pursuant to 22 C.F.R. § 172.2 within 30 days and promptly notify me in writing when service has been effected. When I receive that notification, I will enter an additional Order denying the federal defendants' motions to dismiss and motions for summary judgment for the reasons contained in this Memorandum. I will then certify for immediate appeal pursuant to 28 U.S.C. § 1292(b): 1) the Order denying the federal defendants' motions to dismiss and motions for summary judgment; 2) the Order in *Egervary II* (denying the attorney defendants' motions for summary judgment); 3) the Order in *Egervary III* (denying in part and granting in part the attorney defendants' motions for summary judgment); and 4) the Orders of March 6, 2001 and March 23, 2001 (granting plaintiff leave to amend the complaint to re-assert claims against the federal defendants).

If accepted by the Court of Appeals, the certification will eliminate any potential *"Hurlman"* problem, allow the parties to avoid multiple appeals, and permit the Court to address all of the intricate and intertwined issues in this action at the same time. In my view, these Orders involve controlling questions of law as to which there is substantial ground for differences of opinion and immediate appeal from them may materially advance the ultimate termination of the litigation.

### ORDER

AND NOW, —— this day of September, 2001, for the reasons contained in the accompanying memorandum, it is ORDERED that:

1) Discovery is stayed until further Order; and

2) Plaintiff may within 30 days of this Order perfect service pursuant to 22 C.F.R. § 172.2; and

3) Plaintiff shall promptly notify the Court in writing when service has been perfected by filing a certificate of service with the Clerk of Court.

---

41. I am in receipt of correspondence from the attorney defendants and plaintiff regarding the attorney defendants' subpoena of plaintiff's medical records. The attorney defendants are entitled to that discovery, but it will be deferred pending action by the Court of Appeals.